UNITED STATES of America

v.

SALAMONE, Salvatore, Appellant.

No. 85–5288.

United States Court of Appeals,
Third Circuit.

Argued Feb. 10, 1986.
Decided Sept. 9, 1986.

Alan Silber (argued), Merrill N. Rubin, Silber & Rubin, P.C., New York City and Newark, N.J., Stanley Weinberg, Robert C. Fogelnest, Fogelnest & Lynn, Philadelphia, Pa. and Bloomsburg, Pa., Robert Dowlut, Washington, D.C., for appellant.

Joel M. Friedman, U.S. Dept. of Justice, Philadelphia Strike Force, Organized Crime & Racketeering Section, Philadelphia, Pa., Karen Skrivseth (argued), William C. Bryson, U.S. Dept. of Justice, Washington, D.C., for appellee.

Before HIGGINBOTHAM and STAPLETON, Circuit Judges, and TEITELBAUM, District Judge.*

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

This appeal arises from the conviction of appellant Salvatore Salamone pursuant to a multicount indictment charging him with various firearms offenses.[1] Our opinion is restricted to one issue: whether potential jurors in an action involving charges brought under the gun control statutes may be dismissed for cause solely due to their affiliation with the National Rifle Association.[2] For the reasons set forth below we will reverse the judgment of the district court.

### I.

Appellant was tried before a jury in the United States District Court for the Middle

---

\* Honorable Hubert I. Teitelbaum, United States District Judge for the Western District of Pennsylvania, sitting by designation.

1. Appellant Salamone was convicted on one count of possession of an illegally made machine gun in violation of 26 U.S.C. § 5861(c); one count of possession of an unregistered machine gun in violation of 26 U.S.C. § 5861(d); one count of conspiracy to violate 18 U.S.C. § 924(a) relating to firearms offenses, in violation of 18 U.S.C. § 371; and three counts of falsifying firearms transaction records in violation of 18 U.S.C. §§ 2 and 924(a).

2. Appellant also raises the following contentions:
 1. Salamone was unfairly prejudiced by the improper admission of "other crimes" evidence by the government.

2. The trial court erred in permitting the government to prove multiple conspiracies when only a single conspiracy was charged.
3. Salamone's conviction for substantive offenses pursuant to Counts 5, 6, and 7 must be reversed if this court finds error in the conspiracy conviction pursuant to Count 4.
4. The trial court's accomplice instructions deprived Salamone of a fair trial.
5. The sentence imposed by the trial court constitutes a violation of due process and an abuse of discretion pursuant to Federal Rule of Criminal Procedure 32 because it was disproportionately severe.
After carefully reviewing the foregoing contentions, we find them to be without merit.

District of Pennsylvania on various firearms charges alleging the possession of and failure to register an illegally made machine gun, and conspiracy to falsify, and falsification of, firearms transaction records through the use of fictitious names for the purchase of handguns. Prior to trial, during *voir dire*, the district court excused for cause one potential juror and five potential alternates solely on the basis of their affiliation with the National Rifle Association ("NRA"). Of the jurors selected, ten had firearms in their homes. Of the six alternates selected, five had firearms in their homes. Two of the alternates ultimately served on the jury. Salamone was convicted on six of the seven counts with which he was charged. He was sentenced to a total of twenty years imprisonment and $35,000 in fines. This appeal followed.

## II.

Appellant's challenge to the constitution of the jury before which he was tried is two-fold. First, Salamone analogizes the exclusion of NRA members from his petit jury to the "so-called 'death-qualified' juries wherein those individuals who adamantly refuse to impose the death penalty are disqualified from jury service." Brief of Defendant Appellant at 48. Comparing the instant appeal with the Supreme Court's seminal case on juror disqualification in capital cases, *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), Salamone contends that "[a] jury swept clean of those who oppose[ ] gun control legislation, but who nevertheless were not asked whether they would in every case acquit solely because the charges involved the possession of weapons, cannot withstand the *Witherspoon* test." Brief of Defendant Appellant at 49. Second, Salamone maintains that his sixth amendment right to an impartial jury selected from a fair cross-section of the community was violated. In response, the government contends that Salamone's *Witherspoon* argument cannot prevail because "[a]ppellant has clearly failed to demonstrate that a jury is not impartial

when potential jurors reasonably found by the judge to be hostile to enforcement of the statute involved have been excluded." Brief for the United States at 20. With regard to appellant's sixth amendment claim, the government first argues that the fair cross-section guarantee does not extend to the selection of the actual petit jury before which a defendant is tried. Alternatively, the government argues that even if applicable, the proof requirements established under *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975) and *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979) have not been satisfied and, thus, Salamone's fair cross-section challenge cannot be sustained. In addition to the arguments advanced by the parties, *amicus curiae*, National Rifle Association of America, contends that the alleged violation of appellant's right to an impartial jury is rooted in the fifth amendment's guarantee of due process. *See* Brief of Amicus Curiae National Rifle Association of America ("NRA Brief") at 7–10. We shall consider appellant's sixth amendment claim first.

## III.

■■■ "[T]he Sixth Amendment affords the defendant in a criminal trial the opportunity to have the jury drawn from venires representative of the community." *Taylor v. Louisiana*, 419 U.S. 522, 537, 95 S.Ct. 692, 701, 42 L.Ed.2d 690 (1975). A defendant may establish a constitutional violation by proving that the jury venire did not reflect a fair cross-section of the community. A prima facie violation of the fair cross-section requirement is established upon proof by the defendant "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri*,

439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979).

■ Since *Taylor*, the Supreme Court has consistently maintained that the fair cross-section guarantee is narrow in scope and imposes no requirement that a particular petit jury itself consist of representatives from all distinctive groups in the community. *See Taylor*, 419 U.S. at 538, 95 S.Ct. at 701. This Term, in an opinion issued after oral argument in the instant appeal, *Lockhart v. McCree*, —— U.S. ——, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the Court reiterated its reluctance to bring petit juries within the ambit of the fair cross-section analysis. *McCree* addressed the claim that "death qualification"[3] violates a defendant's right under the sixth and fourteenth amendments to have his guilt or innocence determined by an impartial jury selected from a representative cross-section of the community. In essence, McCree argued that the exclusion of jurors with moral objections to the imposition of the death penalty from the guilt phase of his bifurcated trial resulted in a "conviction-prone" jury rather than one representative of the various viewpoints in the community. Rejecting first the empirical foundation of McCree's claim, *i.e.*, that "death-qualified" juries are "conviction-prone," the Court proceeded to reject the constitutional basis of his argument. Writing for the majority, Justice Rehnquist stated that "[t]he limited scope of the fair cross-section requirement is a direct and inevitable consequence of the practical impossibility of providing each criminal defendant with a truly 'representative' petit jury ... [Thus,] an extension of the fair cross-section requirement to petit juries would be unworkable and unsound...." 106 S.Ct. at 1765.

■ The *McCree* Court did not undertake to fashion a test specifically tailored to govern sixth amendment challenges to the selection methods or composition of petit juries. Instead, the Court noted that under the current proof requirements of the sixth amendment fair cross-section analysis, McCree's challenge to the selection of his petit jury could not prevail. Focusing on the threshold requirement of the *Duren* test, the Court indicated that the category of "distinctive" groups, the exclusion of which is prohibited by the sixth amendment, is narrowly circumscribed. The Court observed: "The essence of a 'fair cross-section' claim is the systematic exclusion of 'a "distinctive" group in the community.' In our view, groups defined solely in terms of shared attitudes that would prevent or substantially impair members of the group from performing one of their duties as jurors ... are not 'distinctive groups' for fair cross-section purposes." 106 S.Ct. at 1765 (citations omitted).[4] Similarly, applying the *Duren* requirements to the instant appeal, Salamone's sixth amendment claim that the exclusion of NRA members from his petit jury deprived him of a representative jury must also fail.[5] The strong suggestion

---

3. "Death qualification" refers to the exclusion of "the so-called '*Witherspoon*-excludable[s]'" from a jury panel. *See Lockhart v. McCree*, —— U.S. ——, 106 S.Ct. 1758, 1761, 90 L.Ed.2d 137 (1986). "*Witherspoon*-excludable," in turn, refers to a prospective juror whose conscientious or religious scruples toward the imposition of the death penalty would "'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *See Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980), and modifying *Witherspoon v. Illinois*, 391 U.S. 510, 522 n. 21, 88 S.Ct. 1770, 1777 n. 21, 20 L.Ed.2d 776 (1968)).

4. The government in the instant appeal also argued along this line: "We do not believe that cross-section analysis turns on the views of a distinctive group on a single issue." *See* Supplemental Brief For the United States at 14–15.

5. Although Salamone contends that an essential element of the *McCree* calculus is lacking here, *i.e.*, the determination that the shared attitudes of NRA supporters would in fact "prevent or substantially impair" their ability to sit impartially in cases involving illegal possession of firearms, we have little doubt that under *McCree* the exclusion of NRA members after proper inquiry would not run afoul of the fair cross-section requirement of the sixth amendment. *See McCree*, 106 S.Ct. at 1766 ("In sum, '*Witherspoon*-excludables,' or for that matter any other

from the *McCree* Court that the "shared attitudes" of a given group is insufficient to qualify it as a "distinctive group" in society for purposes of the sixth amendment compels us to reject Salamone's fair cross-section challenge. That Salamone's claim fails under the analytic framework of the fair cross-section requirement, however, does not leave appellant without a cognizable challenge of the selection of his petit jury.

### IV.

Although appellant Salamone's claim does not rise to the level of a sixth amendment violation, our review of the record in light of his *Witherspoon* argument leads us inexorably to the conclusion that the trial judge abused his discretion in conducting the *voir dire* proceedings.

During *voir dire* for the main jury panel the court posed the following questions to the prospective jurors:

THE COURT: ... Are you now or have you ever been a member of or affiliated in any way with the National Rifle Association?

MR. LAUGHLIN: I've been a member of the NRA.

THE COURT: All right. Do you support the principles of that organization, Mr. Laughlin?

MR. LAUGHLIN: Yes, I do.

THE COURT: Okay. Mrs. Houtz.

MRS. HOUTZ: My husband is a member of NRA. He does support it.

THE COURT: And he does support it?

MRS. HOUTZ: Yes.

THE COURT: All right. Are you now or have you ever been a member of or affiliated in any way with a gun, marksmanship or sporting club/organization? Mr. Laughlin.

MR. LAUGHLIN: I belong to the Bucktail club and hunting club in Emporium.

THE COURT: Are you now or have you ever been a member of or affiliated in any way with a survivalist club or organization?

The United States Constitution, as amended by the Bill of Rights, the first ten amendments, it states in one of those amendments, "The right of the people to keep and bear arms shall not be infringed." The United States has, in fact, laws restricting the possession and transfer of automatic weapons and machine guns; additionally, it has laws requiring, under most circumstances, buyers of firearms to supply certain information and to fill out documents at the time firearms are purchased. The Courts of the United States have consistently ruled that such laws are proper and are not in conflict with the provision of the Bill of Rights which I have just read to you about the right of the people to keep and bear arms not being infringed. Despite such Court rulings, is any juror opposed to such laws on constitutional grounds or other grounds?

(NO RESPONSE)

THE COURT: The possession and transfer of an automatic weapon or machine gun is, in most cases, illegal. If I should instruct you along those lines at the conclusion of the trial, with [sic] any juror have any difficulty following any such instruction for any reason? Is any juror opposed to gun control? I would assume, Mr. Laughlin, you are opposed to it?

MR. LAUGHLIN: That's correct, yes.

THE COURT: And I would assume, Mrs. Houtz, you are opposed to it?

MRS. HOUTZ: Yes.

THE COURT: Anybody else opposed to gun control? Mr. Hayes.

MR. HAYES: Yes.

THE COURT: Are you opposed to all gun control or small arms control or what?

group defined solely in terms of shared attitudes that render members of the group unable to serve as jurors in a particular case, may be excluded from jury service without contravening any of the basic objectives of the fair cross-section requirement.").

MR. HAYES: I would just be opposed to shotguns and rifles.

THE COURT: Shotguns and rifles, but you would not be opposed to control with respect to, let's say, Saturday night specials, is that what you're saying?

MR. HAYES: Yes.

THE COURT: All right. Anybody else with a yes answer?

Notwithstanding your opposition to certain gun control, Mr. Hayes, do you feel you could serve fairly and impartially on this jury?

MR. HAYES: Yes.

App. 63A–65A.

After completion of *voir dire*, the district court entertained challenges for cause. The following exchange took place:

MR. CLARK: Your Honor, the government would challenge for cause Mr. Laughlin.

THE COURT: On what ground?

.　　.　　.　　.　　.

MR. CLARK: He stated he was a former member of the NRA and is—

THE COURT: Well, why—

MR. CLARK: He's a member and firm opponent—

THE COURT: Wait.

MR. CLARK: —of gun control.

THE COURT: Well, why is that disqualification for cause? It may be, but I need some illumination on that.

MR. CLARK: Your Honor, the government's position in respect to that would be that because the charges here deal with the regulation of the possession of automatic weapons, machine guns and because the charges also deal with the falsification of ATF Forms 4473, which are forms of gun control.

THE COURT: Well, I have got enough on it now. What is your—do you oppose that challenge?

MR. CASALE: Yes.

THE COURT: What is the basis of the opposition?

.　　.　　.　　.　　.

MR. CASALE: The basis of the opposition is that the defense doesn't feel that any member of the NRA *automatically disqualifies* unless he says, I can't sit on this jury fairly.

THE COURT: Well, the NRA blocked a bill in the last Congress which would have prevented the importation and sale and, I believe, manufacture of armor piercing bullets. That legislation was supported by the police chiefs and police organizations throughout the nation. And *I think that somebody who is a member of that organization may well not be able to sit on this case impartially.* So I'll grant that one.

App. 70A–71A (emphasis added). The government made no further challenges for cause.[6]

During *voir dire* for the selection of alternates, several jurors indicated some affiliation with the NRA. Mrs. Hart and Mrs. Shatford stated that their husbands were members of the NRA. *See* App. 94A, 98A. Mr. Stavisky indicated that he supported the principles of the NRA. *See* App. 97A. Mr. Brown represented that he was a life member of the NRA. *See* App. 102A. And, finally, Mrs. Gemberling indicated that five of her relatives were members of the NRA. *See* App. 107A. All were challenged and excluded for cause solely on the basis of their affiliation with the NRA.[7]

---

**6.** Both Mrs. Houtz and Mr. Hayes were eliminated from the jury on peremptory challenges. It is unclear from the record which party exercised the challenges.

**7.** During *voir dire* of the alternates, the court did not specifically repeat the questions that had been directed to the main panel members. Rather, each juror was instructed to inform the court if they would have answered any of the

questions posed to the main panel in the affirmative. This procedure is considered within the trial court's discretion in conducting *voir dire. See United States v. Delval*, 600 F.2d 1098, 1102 (5th Cir.1979) (decision whether to question prospective jurors individually or collectively within trial court's discretion); *accord United States v. Starks*, 515 F.2d 112, 124–25 (3d Cir.1975) (recognizing discretion, yet favoring individual inquiry on facts of that case). The following

## A.

In general, the allegation on appeal that the trial judge improperly conducted the *voir dire* examination of prospective jurors, in the absence of plain error, will not be heard where no objection is made before the district court. Fed.R.Crim.P. 51, 52(b). *See also United States v. Bryant,* 471 F.2d 1040, 1044 (5th Cir.1972) ("[T]he method and manner of conducting a *voir dire* are left to the discretion of the trial judge and . . . ordinarily, unless specific objection is made at the time, *voir dire* issues raised on appeal will not be noticed."). *Accord United States v. Dickens,* 695 F.2d 765, 774–75 (3d Cir.1982) (trial court's failure to question jurors regarding racial prejudice not an abuse of discretion where defendants never objected to scope of inquiry); *United States v. Flores-Elias,* 650 F.2d 1149, 1151 (9th Cir.1981) (where neither party submitted additional questions or objected to the scope of the court's questions, the appellate court would review the conduct of *voir dire* only to determine whether there was plain error). Without expressly arguing that Salamone failed to preserve his jury selection challenge for appeal, the government twice notes that appellant did not renew his objections to the district court's exclusion for cause of all potential jurors with NRA affiliations at

the time the alternates were questioned. *See* Brief for the United States at 15; Supplemental Brief for the United States at 13 n. 6. Thus, as a preliminar:, matter. we find that Salamone's initial objection in light of the subsequent circumstances surrounding the *voir dire* of the alternates was sufficient to preserve the selection issue for this appeal.

During *voir dire* of the main jury panel, defense counsel expressly registered an objection to the summary dismissal of Mr. Laughlin stating that "the defense doesn't feel that any member of the NRA automatically disqualifies unless he says, I can't sit on this jury fairly." App. 71A. The trial judge nevertheless sustained the challenge pointing to recent action of the NRA on legislation before the United States Congress as indicative of the probable bias of "member[s] of that organization." App. 71A. Subsequently, near the end of the *voir dire* of the main panel, the trial court volunteered the following statement:

THE COURT: Before I forget it, I suppose it would be appropriate, since the government apparently is uneasy about people who own guns, for me to tell you what I do have.

I have a shotgun. I don't know where any shells are for it, and I never killed anything with it. I have a very fine .45

---

excerpts reflect the responses of the excluded alternates with regard to their affiliation with the NRA.

THE COURT: Would you have answered yes to any of the questions?
MS. SHATFORD: Yes.
THE COURT: What ones?
MS. SHATFORD: . . . My husband does own guns. He is a member of the NRA.
App. 94A.
THE COURT: Would you have answered yes to some of the questions?
MR. STAVISKY: Yes.
THE COURT: What ones?
MR. STAVISKY: One is, I have firearms, hunting rifles, and I support the principles of the NRA; I'm not a member.
App. 97A.
THE COURT: Would you have answered yes to any of the questions?
MRS. HART: Yes. My husband is a member of the NRA and we have—he has several rifles and shotguns and he has a handgun.
App. 98A.

THE COURT: Would you have answered yes to any of [the questions we put to the first jurors]?
MR. BROWN: Yes.
THE COURT: What ones?
MR. BROWN: I'm a life member of the NRA. I own hunting guns.
App. 102A
THE COURT: Would you have answered yes to any of [the questions we asked the first jurors in this case?]
MRS. GEMBERLING: Yes.
THE COURT: What ones?
MRS. GEMBERLING: . . . There's five of them in my family that are members of the NRA. My husband has hunting guns and pistols and I am opposed to gun control.
App. 107A.
Each of the alternates were summarily dismissed *solely* on the basis of their "close affiliation with the NRA," *see* App. 100A, without further inquiry from the court or argument by counsel. *See also* App. at 105A, 107A.

which was given to me by my brother-in-law as appreciation for having handled the affairs of his father. It's a marksman's gun. I have never shot that. I don't know where the bullets are for it, but it's a very expensive gun. And my brother-in-law is a member of the NRA, and a very sta[un]ch member. He wanted to give me a membership in the organization and I refused. And I do not support the principles of the NRA.

I cannot grasp why they [the NRA] really opposed that armor piercing bullet—which I think is very much a concern to police chiefs and policemen.

App. 82A–83A. Finally, just prior to the commencement of *voir dire* of the alternates, the following colloquy took place between defense counsel and the trial judge when defense counsel attempted to employ reasoning similar to that advanced for the exclusion of NRA members to support a challenge for cause of a juror who advocated gun control:[8]

THE COURT: Do you have any [challenges for cause], sir?

MR. CASALE: Miss Techmanski-Hoffman.

THE COURT: On what basis?

MR. CASALE: Who states she supports gun control. I think it's the vice versa of the NRA argument the government has made.

THE COURT: Well, it doesn't seem to me it is, but why—elaborate on the argument a bit.

MR. CASALE: I feel that it may—her support for gun control, not being neutral, may prejudice her in that this case involves regulations involving gun control.

THE COURT: All right. Well, I'll ask her.

. . . . .

Miss Techmanski-Hoffman, do you feel that your ... [advocacy of] handgun control would in any way affect your ability to be fair in this case?

MS. HOFFMAN: I've thought about that, Your Honor, I think it might.

THE COURT: All right.

App. 84A–85A.

We conclude that the initial, contemporaneous objection by defense attorney, Casale, adequately apprised the trial judge of the nature of Salamone's claim. In light of the foregoing circumstances, any failure of appellant to renew his earlier objection was reasonably justified and will not operate to extinguish his claim on review. After expressing a general view about the policy positions advanced by the NRA, the trial judge proceeded to voice his own personal rejection of that organization's principles. The trial court's particularized inquiry of Ms. Hoffman, though appropriate in and of itself, may have indirectly suggested to defense counsel that the trial judge viewed NRA members as presumptively biased in cases involving gun control but not advocates of gun control. Under these circumstances, we do not think it was necessary for Salamone to persist in raising his objection to the summary exclusion of jurors with affiliations with the NRA as a prerequisite to raising his claim on appeal. *Cf. Industrial Development Board of the Town of Section, Alabama v. Fuqua Industries*, 523 F.2d 1226, 1237 (5th Cir.1975)("The failure to object [to jury instructions] may be disregarded if the party's position has previously been clearly made to the court and it is plain that a further objection would be unavailing.") (quoting C. Wright & A. Miller, Federal Practice and Procedure § 2553, at 639–40 (1970)).

#### B.

In *Rosales-Lopez v. United States*, 451 U.S. 182, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981), the Supreme Court observed that "*[v]oir dire* plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will

---

**8.** When asked whether she would have responded affirmatively to any of the questions posed to the main panel, the challenged juror responded:

MS. HOFFMAN: My husband and I are advocates of handgun control.

App. 79A.

be honored. Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled. Similarly, lack of adequate *voir dire* impairs the defendant's right to exercise peremptory challenges." *Id.* at 188, 101 S.Ct. at 1634 (citations omitted). Federal Rule of Criminal Procedure 24[9] commits to the trial judge the function of conducting an appropriate *voir dire.* "Because the obligation to impanel an impartial jury lies in the first instance with the trial judge, and because he must rely largely on his immediate perceptions, federal judges have been accorded ample discretion in determining how best to conduct the *voir dire.*" *Rosales-Lopez,* 451 U.S. at 189, 101 S.Ct. at 1634. This discretion extends to the determination of what questions should be asked to the potential jurors. *See generally Smith v. United States,* 431 U.S. 291, 308, 97 S.Ct. 1756, 1767, 52 L.Ed.2d 234 (1977); *United States v. McDonnell,* 573 F.2d 165, 166 (3d Cir.1978); *United States v. Segal,* 534 F.2d 578, 581 (3d Cir. 1976). "This 'testing' by *voir dire* remains a preferred and effective means of determining a juror's impartiality and assuring the accused of a fair trial." *United States v. Martin,* 746 F.2d 964, 973 (3d Cir.1984).

According full recognition to these general principles, however, it is nonetheless equally clear that the trial judge's broad discretion is not without limitation. "[W]hile impaneling a jury the trial court has a serious duty to determine the question of actual bias.... In exercising its discretion, the trial court must be zealous to protect the rights of an accused." *Dennis v. United States,* 339 U.S. 162, 168, 70 S.Ct. 519, 521, 94 L.Ed. 734 (1950). Thus, the discretion committed to the trial court is "subject to the essential demands of fairness." *Aldridge v. United States,* 283 U.S. 308, 310, 51 S.Ct. 470, 471, 75 L.Ed. 1054 (1931); *United States v. Wooton,* 518 F.2d 943, 945 (3d Cir.), *cert. denied,* 423 U.S. 895, 96 S.Ct. 196, 46 L.Ed.2d 128 (1975); *United States v. Napoleone,* 349 F.2d 350, 353 (3d Cir.1965).

In the instant appeal, Salamone's challenge to the district court's *voir dire* does not allege a failure to uncover actual bias thereby resulting in the paneling of partial jurors. Rather, Salamone's objection is to the *presumed* bias of potential jurors which occasioned the arbitrary exclusion of an entire class of otherwise qualified jurors from his panel. "In disqualifying all NRA-related jurors without particularized inquiry," Salamone argues, "the trial judge simply assumed that any person connected with that association was incapable of fairly applying existing law."[10] Supplemental Brief of Defendant-Appellant at 3. *Compare King v. State,* 287 Md. 530, 414 A.2d 909 (Ct.App.1980) (in prosecution for distribution and for possession of marijuana, error to exclude two jurors for cause on basis that they favored change in law with regard to possession and distribution of marijuana without further inquiry into their ability to set aside their personal beliefs and apply the law to the facts).

**9.** Rule 24 provides in pertinent part:

(a) Examination. The court may permit the defendant or his attorney and the attorney for the government to conduct the examination of prospective jurors or may itself conduct the examination. In the latter event the court shall permit the defendant or his attorney and the attorney for the government to supplement the examination by such further inquiry as it deems proper or shall itself submit to the prospective jurors such additional questions by the parties or their attorneys as it deems proper.

**10.** Salamone further suggests that

[t]his unfounded assumption—which would render the President of the United States, the Vice-President, their wives, and over 3 million other Americans unfit to serve as jurors in gun-law cases—is flatly inconsistent with our democratic traditions. Its effect [is to] invidiously ... exclude from appellant's jury all persons connected to a distinct group solely because that group had chosen to affiliate for a political purpose.

Supplemental Brief of Defendant-Appellant at 3–4. More specifically, *Amicus* National Rifle Association argues that the conduct of the district court constitutes an encroachment on the excluded jurors' first amendment rights of freedom of association. *See* NRA Brief at 10–11. Because we consider only the rights of the accused, we do not reach the first amendment issue.

The government contends that no abuse occurs in the exclusion of jurors whose views on gun control might affect their ability to serve impartially on a jury considering implementation of gun control statutes. The government conveniently ignores, however, the total absence on this record of any indication that the excluded jurors individually possessed such views which would rightfully justify their dismissal. Instead, the government relies on a theory of "implied bias,"[11] see *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), in suggesting that "where as here, the charges involve state and federal gun registration—a subject on which the NRA's opposition is well-known—a trial judge is well within his discretion in excluding those opponents from the jury for cause." Brief for the United States at 18 n. 8. Under such circumstances, the government maintains "[i]f the judge believes, as he reasonably could, that bias against enforcing a particular statute would make it difficult for the juror to vote

for conviction even if the evidence supported guilt, additional questioning would simply be superfluous." *Id.* at 19.

We find the government's position untenable and potentially dangerous. To allow trial judges and prosecutors to determine juror eligibility based solely on their perceptions of the external associations of a juror threatens the heretofore guarded right of an accused to a fair trial by an impartial jury as well as the integrity of the judicial process as a whole. Taken to its illogical conclusion, the government's position would sanction, *inter alia*, the summary exclusion for cause of NAACP members from cases seeking the enforcement of civil rights statutes, Moral Majority activists from pornography cases, Catholics from cases involving abortion clinic protests, members of NOW from sex discrimination cases, and subscribers to Consumer Reports from cases involving products liability claims.[12]

 Moreover, the government's position misconceives the grounds for juror dis-

**11.** In *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), the Supreme Court declined to impute bias to a properly seated juror who subsequently applied for employment with the District Attorney's Office prosecuting the case on which he sat. The Court held that a post-conviction hearing in which defendant is afforded the opportunity to prove actual bias was all that was constitutionally required. *See id.* at 217, 102 S.Ct. at 946. In a separate concurrence, Justice O'Connor indicated her belief that the presumption of implied bias may be appropriate under certain circumstances. *See id.* at 222, 102 S.Ct. at 948. (O'Connor, J., concurring) ("Some examples might include a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction."). While we make no categorical rejection of the theory of "implied bias", we note that Justice O'Connor's hypotheticals bear no resemblance to this case.

Just recently this court considered the propriety of the trial court's *refusal* to exclude a juror under the "implied bias" theory. *See United States v. Ferri*, 778 F.2d 985 (3d Cir.1985) (refusing to find error in the district court's refusal to disqualify a juror under the theory of implied bias); *see also Dennis v. United States*, 339 U.S. 162, 70 S.Ct. 519, 94 L.Ed. 734 (1950) (rejecting

argument that employees of Federal Government were inherently biased in contempt action for failure to appear before the House Committee on UnAmerican Activities and therefore should have been excluded for cause on *voir dire*); *Richardson v. Communication Workers of America*, 530 F.2d 126 (8th Cir.1976) (finding no abuse of discretion by trial court in refusing to summarily disqualify from jury all union members without some indication of bias in wrongfully discharged employee's action against unions).

**12.** We recognize that the government's argument rests upon a theory of implied partiality of prospective jurors who belong to "anti-enforcement" organizations. However, we think that the distinction the government attempts to make is precarious at best. Members of an overzealous organization favoring expansive application of particular statutes may likewise be "presumed" to lack the requisite impartiality to faithfully apply the law to the facts adduced at trial. Arguments similar to the government's have been rejected in other contexts. *See, e.g., United States v. Alabama*, 582 F.Supp. 1197, 1203 (N.D.Ala.1984) ("[J]udge's color, sex or religion does not constitue bias in favor of that color, sex or religion."); *Pennsylvania v. Local Union 542*, 388 F.Supp. 155, 165 (E.D.Pa.1974) (Black judge is not *per se* disqualified from adjudicating claims of racial discrimination.).

qualification. "Jury competence is an individual rather than a group or class matter." *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 220, 66 S.Ct. 984, 986, 90 L.Ed. 1181 (1946). Challenges for cause "permit rejection of jurors on narrowly specified, provable and legally cognizable bas[e]s of partiality." *Swain v. Alabama*, 380 U.S. 202, 220, 85 S.Ct. 824, 836, 13 L.Ed.2d 759 (1965). The central inquiry in the determination whether a juror should be excused for cause is whether the juror holds a particular belief or opinion that will "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). *See also Patton v. Yount*, 467 U.S. 1025, 1036–37, 104 S.Ct. 2885, 2891–92 & n. 12, 81 L.Ed.2d 847 (1984) (noting that the constitutional standard for juror impartiality rests on the determination whether "he can lay aside his opinion and render a verdict based on the evidence presented in court"). Juror bias need not be established with "unmistakable clarity." *Witt*, 105 S.Ct. at 852. Thus, the factual determination by the trial court whether a juror can in fact serve impartially is entitled to "special deference" by the reviewing court. *Yount*, 104 S.Ct. at 2892. In the instant appeal, however, at no time were the excluded jurors questioned as to their ability to faithfully and impartially apply the law. Indeed, no inquiries whatsoever were directed to the excluded jurors to determine the nature and extent of their commitment to any principles that might have impaired their ability to serve impartially. While we recognize that the scope and content of *voir dire* is committed to the sound discretion of the trial court, that discretion will "include[ ] the decision as to

what questions should be asked when the court itself decides to examine the prospective jurors *so long as inquiries relevant to the discovery of actual bias are not omitted." United States v. Dansker*, 537 F.2d 40, 56 (3d Cir.1976) (emphasis added). Where the appropriate inquiries have been made and the district court has made a judgment on the basis of the jurors' responses, normally, that judgment will not be disturbed.[13] The usual factors cautioning restraint in appellate review, *i.e.*, credibility and demeanor evidence, however, are simply absent from this record. Thus, the "factual determination" by the district court in the instant appeal, being totally devoid of any foundation, leaves us with the single conclusion that the *voir dire* was inadequate to preserve and protect the rights of the accused. *See Dennis*, 339 U.S. at 168, 70 S.Ct. at 521. Absent the requisite nexus—that the challenged affiliation will "prevent or substantially impair" a juror's impartiality—no juror may be excluded for cause on the basis of his or her membership in an organization that adheres to a particular view. Failure to make the necessary inquiry deprives the trial court of the benefit of the factual predicate that justifies an exclusion for cause. In the words of Mr. Justice Murphy in *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 220, 66 S.Ct. 984, 985, 90 L.Ed. 1181 (1946), uttered over forty years ago, the conduct of the trial judge and the position urged by the government today would "open the door to class distinctions and discriminations which are abhorrent to the democratic ideals of trial by jury."[14]

■■■ We conclude that the cursory disqualification by the district judge of all jurors with NRA affiliations constitutes an

---

13. Nothing in this opinion is intended to upset settled practice in the district courts of excluding without further inquiry prospective jurors with well recognized characteristics warranting dismissal, such as blood relation to the parties or counsel.

14. *Cf. Barber v. Ponte*, 772 F.2d 982, 1000 (1st Cir.1985) (in banc) (distinguishing between challenges to petit juries on grounds of statistical disparity and on grounds of specific and

systematic exclusion) ("If certain people are specifically and systematically excluded from jury duty, then the jury-administrating authority would have created its own group. Clearly, the state has no right to deliberately exclude specific classes or groups from juries without some very special reason. Thus, it may not *forbid* blue-collar workers, chess players, Masons, etc., from serving on juries.") (emphasis in original).

abuse of discretion and is not in accord with the "essential demands of fairness" to which appellant was entitled.

## C.

The question remains, however, whether Salamone is entitled to relief on this basis. In this Circuit we adhere to the rule that "the trial court's determination as to a juror's actual bias will be reversed only for a manifest abuse of discretion." *Government of Virgin Islands v. Gereau*, 502 F.2d 914, 934 (3d Cir.1974) (citing *Government of Virgin Islands v. Williams*, 476 F.2d 771, 775 (3d Cir.1973)). As indicated above, we think that such a "manifest abuse" is evident on this record, and on this basis alone Salamone is entitled to a new trial.[15] The government, however, citing *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), properly notes that not every error, even constitutional error, requires automatic reversal of a judgment of conviction. Thus, the government maintains that, manifest abuse notwithstanding, the harmless error doctrine applies and the improper exclusion of a juror for cause is not reversible error unless accompanied by a showing of substantial prejudice to the defendant. *See* Supplemental Brief for the United States at 17–19. Salamone argues that because the abuse of discretion involved in the instant proceeding produced a result more analogous to the systematic exclusion of specific groups from petit and grand juries, which the Supreme Court has indicated requires automatic reversal, *see, e.g., Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972) (exclusion of blacks); *Ballard v. United States*, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946) (exclusion of women);

*Thiel v. Southern Pacific, Co.*, 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946) (exclusion of wage-laborers), his claim similarly "is not amenable to harmless-error review." Supplemental Brief of Defendant-Appellant at 2–5 (quoting *Vasquez v. Hillery*, —— U.S. ——, 106 S.Ct. 617, 624, 88 L.Ed.2d 598 (1986)).

At the outset, we note that were we faced with the inadequate questioning of a single excluded juror we might apply a different standard for determining the prejudicial effect of the erroneous exclusion. However, where such a "manifest abuse of discretion" results in the wholesale exclusion of a particular group, we do not deem it necessary for the defendant to affirmatively demonstrate the existence of actual prejudice in the resulting jury panel. Under such circumstances, prejudice may be presumed. As the Supreme Court observed in *Peters v. Kiff*,[16] 407 U.S. 493, 504, 92 S.Ct. 2163, 2169, 33 L.Ed.2d 83 (1972):

> It is the nature of the practices here challenged that proof of actual harm, or lack of harm, is virtually impossible to adduce. For there is no way to determine what jury would have been selected under a constitutionally valid selection system, or how that jury would have decided the case. Consequently, it is necessary to decide on principle which side shall suffer the consequences of unavoidable uncertainty.

In the instant appeal, essential demands of fairness dictate that the errors of the prosecutor and trial judge not be visited upon appellant, Salamone. The government improperly "created its own group," *Barber v. Ponte*, 772 F.2d 982, 1000 (1st Cir.1985) (in banc), and the trial court, without justi-

---

**15.** In this regard Judge Stapleton's concurrence is not at odds with our approach. *See* Concurring Opinion typescript at 1. We reach the harmless error issue here without mandating its application and conclude that the wholesale, arbitrary exclusion of a class of jurors from appellant's panel, the resulting harm to the integrity of the judicial system and the expanded use of the peremptory challenges by the prosecution together are sufficiently prejudicial to require a new trial. As acknowledged in the concurrence, "here ... there is the *appearance*

of the prosecution, with the assistance of the court, attempting to 'stack the deck' against the defendant." Concurring Opinion typescript at 1232. We find that such conduct is presumptively prejudicial and thus constitutes a real harm to the defendant.

**16.** *Peters* involved a claim by a white defendant that the systematic and arbitrary exclusion of blacks from his grand and petit juries deprived him of due process of law.

**1228**

fication, excluded all members of that group from Salamone's jury. To require appellant to adduce *proof* of what *could* have happened puts the defendant in the predicament referred to in *Peters* of providing proof that "is virtually impossible to adduce." This leaves the defendant without an effective remedy for improper conduct in the selection process and provides incentive for such conduct to recur. Accordingly, we conclude that the wholesale, arbitrary and irrational exclusion of jurors with affiliations with the NRA from Salamone's jury is presumptively prejudicial.

The government nevertheless contends that the Supreme Court's decision in *Hobby v. United States*, 468 U.S. 339, 104 S.Ct. 3093, 82 L.Ed.2d 260 (1984) suggests that most errors in jury selection procedures will be subject to harmless error analysis. In *Hobby,* the Court considered whether the statistical underrepresentation of blacks and women in the post of jury foreman over a seven year period in violation of the fifth amendment required the reversal of the conviction of petitioner, a white male. The Court concluded that reversal was not required. In reaching its conclusion, however, the Court, distinguishing *Peters, supra,* observed that none of the due process interests of the defendant were threatened by discrimination in the selection of grand jury foremen. In particular, the Court noted that the "societal value in assuring diversity of representation on grand and petit juries," 104 S.Ct. at 3096, was not implicated as long as the grand jury "*as a whole* serves the representation-

al due process values expressed in *Peters.*" *Id.* at 3097 (emphasis in the original). Because the duties assigned to the jury foreman are "ministerial," the Court concluded that discrimination in the appointment to that post does not "impugn[ ] the fundamental fairness of the process itself so as to undermine the integrity of the indictment." *Id.* Nothing in *Hobby* suggests that the nature of the injury alleged here constitutes or is governed by harmless error.

Perhaps more instructive is current Supreme Court precedent on the improper exclusion in a capital case of jurors who qualify under the test enunciated in *Witherspoon.* In a brief *per curiam* decision the Court in *Davis v. Georgia,* 429 U.S. 122, 123, 97 S.Ct. 399, 399, 50 L.Ed.2d 339 (1976) held that "[u]nless a venireman is 'irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings,' he cannot be excluded; if a venireman is improperly excluded even though not so committed, any subsequently imposed death penalty cannot stand." (Citations omitted.) [17] Strict application of the reasoning of *Davis* to the instant appeal indicates that reversal is appropriate.

 Nor does application of the harmless error doctrine alter this result. From our review of the record we cannot conclude that the error involved in the instant appeal was harmless. Salamone challenges

---

17. On February 24, 1986 the Supreme Court granted certiorari in *Gray v. Mississippi,* 472 So.2d 409 (Miss.1985). *See* — U.S. ——, 106 S.Ct. 1182, 89 L.Ed.2d 299 (1986). The question presented by *Gray* is

was petitioner's right to fair and impartial jury violated in this capital murder trial by trial court's excusing for cause of potential juror who was clearly qualified to be seated under *Adams v. Texas* and *Wainwright v. Witt?*

54 U.S.L.W. 3591 (U.S. March 4, 1986). Thus, the Court is essentially requested to reconsider *Davis* and determine whether the erroneous exclusion of a juror in a death penalty case may be harmless error.

In *Gray,* after refusing to dismiss several jurors who stated unequivocally that they could never vote for the death penalty believing them to be attempting to avoid jury duty, the state court sustained a prosecution challenge for cause of a juror who met the standards of impartiality enunciated in *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980) and *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). The state supreme court held that the defendant was not prejudiced by the court's dismissal of the qualified juror after the prosecution had exhausted its peremptory challenges due to the earlier refusal of the judge to dismiss those prospective jurors who stated that they could never apply the death penalty.

the summary exclusion of *seven* prospective jurors solely on the basis of their affiliation—no matter how attenuated—with the NRA. While we recognize that appellant has no right to a jury of "the proper number of Democrats and Republicans, young persons and old persons, white-collar executives and blue-collar laborers, and so on," *McCree*, 106 S.Ct. at 1767, he is entitled to a jury from which none of those, or any other group, has been summarily excluded without regard to their ability to serve as jurors in the particular case. *See id.* at 1765. "The [consequent] injury is not limited to the defendant—there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts." *Ballard v. United States*, 329 U.S. 187, 195, 67 S.Ct. 261, 265, 91 L.Ed. 181 (1946). Moreover, appellant suffered an even more tangible harm. As noted by Justice Rehnquist in *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 104 S.Ct. 845, 849, 78 L.Ed.2d 663 (1984), "Demonstrated bias in the responses to questions on *voir dire* may result in a juror being excused for cause; hints of bias not sufficient to warrant challenges for cause may assist parties in exercising their peremptory challenges." Freed of the burden of substantiating its challenges for cause, the government in the instant appeal was thereby afforded a broader exercise of its peremptory challenges. Unlike the situation in *McCree* where the Court rejected the argument that the "absence of '*Witherspoon*-excudables' 'slanted' the jury in favor of conviction," 106 S.Ct. at 1767, we cannot conclude with confidence that the *improper* exclusion of the prospective jurors in this case, in conjunction with the expanded use of the peremptory challenges afforded to the government, produced an impartial jury. Nor are we convinced that the representa-

tion of gun owners on Salamone's petit jury resolves the issue. *Cf. Turner v. Murray*, —— U.S. ——, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986) (notwithstanding fact that jury impaneled consisted of eight whites and four blacks, rights of black capital defendant accused of murdering white man were violated where trial judge failed on *voir dire* to question prospective jurors on racial prejudice). *Defensive* possession of weapons by the average citizen is hardly a clear indication of neutrality on the issue of gun control.[18] In sum, we find that the inadequate *voir dire* by the trial court set into motion a series of events, all of which had an incalculable, prejudicial effect on appellant's right to a fair trial by an impartial jury. Thus, we conclude that the erroneous exclusion of prospective jurors with NRA affiliations was not harmless and appellant's judgment of conviction cannot stand.

## CONCLUSION

For the foregoing reasons, the judgment of the district court will be reversed, and the case remanded for proceedings consistent with this opinion.

STAPLETON, Circuit Judge, concurring:

The court's opinion persuasively demonstrates that the district court abused its discretion when it systematically excluded members of the National Rifle Association from Salamone's petit jury with no record basis for concluding that they would be unable to perform the duties of a juror.[1] I also find myself in agreement with the court's conclusion that a new trial is required. Our views differ only in that I am unable to find that Salamone has shown actual prejudice. I reach the same result, however, because I conclude that a show-

---

18. We do not mean to suggest that any of the individual jurors impaneled in appellant's case were excusable for cause on the ground of actual bias. Rather, we find that the expanded use of prosecutorial peremptory challenge necessarily afforded the government a greater opportunity to impanel a jury biased in its favor.

1. Like the majority, I do not reach the issue of whether there has been a Fifth Amendment due process violation.

ing of actual prejudice is not required in a situation of this kind.

Just as the record in this case is devoid of any basis for excluding NRA members, it is similarly devoid of any evidence which would support a finding that those in fact chosen were anything other than impartial, conscientious, law-abiding citizens who reached a conclusion consistent with the law and the facts of the case. "[E]xactly the same twelve individuals could have ended up on his jury through the 'luck of the draw'", and Salamone clearly would have no complaint. *Lockhart v. McCree*, —— U.S. —— 106 S.Ct. 1758, 1767, 90 L.Ed.2d 137 (1986). Accordingly, I cannot subscribe to the suggestion that Salamone's jury has been shown to have been "stacked" against him. *See Witherspoon v. Illinois*, 391 U.S. 510, 523, 88 S.Ct. 1770, 1778, 20 L.Ed.2d 776 (1968). Nor can I agree that the freeing of government peremptory challenges is sufficient prejudice to require a new trial. Every error of exclusion for cause by a trial judge frees a peremptory challenge for someone and the general rule has been that such errors do not require reversal when those actually chosen as jurors have been qualified through the voir dire process. *See McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 555–556, 104 S.Ct. 845, 849–50, 78 L.Ed.2d 663 (1984) (finding that "it ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process" and holding that to obtain a new trial, "a party must first demonstrate that a juror failed to answer honestly a question on *voir dire*, and then further show that a correct resp would have provided a valid basis for a challenge for cause."); *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982) ("[D]ue process does not require a trial every time a juror has been placed in a potentially compromising situation.... The safeguards of juror impartiality, such as *voir dire* ..., are not infallible."); *King v. State*, 287 Md. 530, 414 A.2d 909, 913 (Md.1980) (quoting *Blumenthal & Bickart v. May Co.*, 126 Md. 277, 96 A. 434, 438 (Md.1915)): "The authorities support the proposition that it is not revers-

ible error for the Court of its own motion to exclude a juror, even for insufficient cause, if an unobjectionable jury is afterwards obtained."); *State v. Mathis*, 52 N.J. 238, 245 A.2d 20, 27 (N.J.1968), *rev'd on other grounds sub nom. Mathis v. New Jersey*, 403 U.S. 946, 91 S.Ct. 2277, 29 L.Ed.2d 855, *reh. denied*, 404 U.S. 876, 92 S.Ct. 31, 30 L.Ed.2d 125 (1971).

It is, of course, not surprising that Salamone has not shown that his jury acted differently than would one chosen without the arbitrary exclusions. As the court observes, such a showing is virtually impossible to make. That fact alone counsels against imposing a requirement that actual prejudice be shown. But more importantly, our society's interest in maintaining confidence in the integrity of its criminal justice system mandates that the process in this case be repeated. *See King*, 414 A.2d at 913, ("Although this [*Blumenthal & Bickart*] principle may be applicable in cases where the reason for excusing a juror is related to that particular juror, it is inapplicable when an entire class holding a certain belief is excluded."); *Mathis*, 245 A.2d at 27 ("That [*Blumenthal & Bickart*] rule is sound enough when the focus is merely upon a defendant's entitlement to a *particular juror* ... But when the challenge goes beyond that limited issue and implicates the right to be tried by a jury which is *representative* of the community, it would be no answer to a systematic exclusion to say that the 12 jurors who decided the case were *individually* impartial.") (emphasis in original).

As the court correctly notes, the Supreme Court held in *McCree*, 106 S.Ct. at 1764, that the constitutional requirement of a "representative cross-section of the community" is inapplicable in a case where the exclusion of jurors from a petit jury is at issue. The fair cross-section cases, accordingly, do not aid Salamone in establishing that the district court erred. Nevertheless, the values at stake in those cases are also implicated here and should be taken into account in deciding whether there is to be a remedy.

The alternative holding of *McCree* is that the exclusion of *Witherspoon*-excludables

(i.e. those whose views regarding capital punishment are such as to prevent or substantially impair the performance of their duties as jurors in accordance with their instructions and oath) would not violate the fair cross-section requirement even if it were applicable to petit juries. In the course of reaching this conclusion, the Court distinguished McCree's situation from those involved in the cross-section cases on a basis which also distinguishes this case from *McCree*. The Court emphasized that the jurors excluded from McCree's jury had been reliably found to be unable to faithfully perform their duties as jurors. Here, as in the cases where the cross-section requirement has been found to have been violated, there is no record basis for finding that the excluded jurors were similarly disabled. Accordingly, unlike the exclusion in *McCree*, the exclusion in Salamone's case was a class exclusion wholly unrelated to the capacity of the members of the class to serve as jurors in his case.

The alternative holding of *McCree* was based on the Court's view that the exclusion of jurors who were not able to perform their assigned tasks did not contravene any of the purposes of the fair cross-section requirement. Quoting from *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), the court identified those purposes as:

(1) "guard[ing] against the exercise of arbitrary power" and ensuring that the "commonsense judgment of the community" will act as "a hedge against the overzealous or mistaken prosecutor," (2) preserving "public confidence in the fairness of the criminal justice system," and (3) implementing our belief that "sharing in the administration of justice is a phase of civic responsibility." Id., 419 U.S., at 530–531, 95 S.Ct., at 697–98.

The *McCree* Court went on to distinguish the previously decided cases in which there had been arbitrary class exclusions of blacks, women, and Mexican Americans:

Because these groups were excluded for reasons completely unrelated to the ability of members of the group to serve as jurors in a particular case, the exclusion raised at least the possibility that the composition of juries would be arbitrarily skewed in such a way as to deny criminal defendants the benefit of the common-sense judgment of the community. In addition, the exclusion from jury service of large groups of individuals not on the basis of their inability to serve as jurors, but on the basis of some immutable characteristic such as race, gender, or ethnic background, undeniably gave rise to an "appearance of unfairness." Finally, such exclusion improperly deprived members of these often historically disadvantaged groups of their right as citizens to serve on juries in criminal cases.

Because the "group of *Witherspoon*-excludables" "is carefully designed to serve the state's concededly legitimate interest in obtaining a single jury that can properly and impartially apply the law to the facts of the case at both ... phases of the capital trial," the *McCree* Court found "very little danger" that capital case juries would be arbitrarily skewed. 106 S.Ct. at 1766. Moreover, "because the group of '*Witherspoon*-excludables' includes only those who cannot and will not conscientiously obey the law with respect to issues in a capital case, 'death qualification' hardly can be said to create an 'appearance of unfairness'." 106 S.Ct. at 1766. Finally, according to the *McCree* Court:

... the removal for cause of "*Witherspoon*-excludables" in capital cases does not prevent them from serving as jurors in other criminal cases, and thus leads to no substantial deprivation of their basic rights of citizenship. They are treated no differently than any juror who expresses the view that he would be unable to follow the law in a particular case.

106 S.Ct. at 1766.

The *McCree* Court summarized its holding as follows:

In sum, "*Witherspoon*-excludables," or for that matter any other group defined solely in terms of shared attitudes *that render members of the group unable to serve as jurors in a particular case,* may be excluded from jury service without contravening any of the basic

objectives of the fair cross-section requirement.

106 S.Ct. at 1766 (Emphasis supplied).

The *McCree* Court noted in the course of its analysis that the groups excluded from juries in the fair cross-section cases have "immutable characteristics" and that this distinguishes them from *Witherspoon*-excludables. This also distinguishes members of the National Rifle Association from blacks, women, and Mexican Americans. Nevertheless, in the context of the *McCree* Court's analysis, the meaningful distinction is between arbitrary class exclusions and exclusions based on a determination that the excluded group cannot perform as jurors.

The arbitrary exclusion of citizens based solely on their association in a group like the NRA, poses a threat to the interests protected by the fair cross-section requirement similar to that posed by the exclusion of blacks, women, and Mexican Americans. Because the effects of arbitrary class exclusions based on shared views or associations are impossible to predict and "arbitrary skewing" cannot be ruled out, such exclusions necessarily undermine the confidence of the defendant and the public in the fairness of the process. Moreover, here as in the fair cross-section cases, there is the *appearance* of the prosecution, with the assistance of the court, attempting to "stack the deck" against the defendant. Finally, discrimination in jury selection against a group associated in part for the purpose of influencing political action in which members have a common interest is no more acceptable than similar discrimination which offends other constitutionally protected values.

I make these observations not to suggest that Salamone was entitled to a petit jury representing a fair cross-section of his community, but rather because the interests protected by the fair cross-section requirement have heretofore been considered of sufficient importance to our society that violations have mandated reversals without reference to whether the particular defendant has been able to demonstrate actual prejudice. *Taylor*, 419 U.S. at 532, 95 S.Ct.

at 698 (quoting *Ballard v. U.S.*, 329 U.S. 187, 193, 67 S.Ct. 261, 264, 91 L.Ed. 181 (1946)): ("To insulate the courtroom from either [men or women] may not in a given case make an iota of difference. Yet a flavor, a distinct quality is lost if either sex is excluded."); *Davis v. Georgia*, 429 U.S. 122, 123, 97 S.Ct. 399, 400, 50 L.Ed.2d 339 (1976) (per curiam) (" ... [I]f a venireman is improperly excluded, even though not ... [irrevocably] committed [to vote against the death penalty], any subsequently imposed death penalty cannot stand."). *See also Batson v. Kentucky*, —— U.S. ——, 106 S.Ct. 1712, 1718, 90 L.Ed.2d 69 (1986) ("The harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice.")

For these reasons, we cannot afford to allow Salamone's conviction to stand as a final product of our criminal justice system.