UNITED STATES of America

v.

Corey KEMP, et al.

Criminal Action Nos. 04–370–02 to 04–370–06.

United States District Court, E.D. Pennsylvania.

July 20, 2005.

aforementioned documents because they do not exist. (*See* Rec. Doc. 110, Hr'g Tr., 14, July 14, 2005).

Lustberg, Crummy, Del Deo, Dolan, Griffinger and Vecchione, Newark, NJ, Anthony T. Chambers, Detroit, MI, Lewis Myers, Jr., Chicago, IL, Nathaniel E. Jones, Jr., Baltimore, MD, Nino V. Tinari, Thomas H. Suddath, Jr., Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, for Defendants.

Michael A. Schwartz, Richard J. Zack, Robert A. Zauzmer, Catherine Votaw, Joseph F. Minni, William B. Carr, Jr., Joan L. Markman, United States Attorney's Office, Philadelphia, PA, for Plaintiff.

John D. Tortorella, Kevin H. Marino, Marino & Associates, P.C., Lawrence S.

*MEMORANDUM*

BAYLSON, J.

Table of Contents

I. Introduction ................................................... 693

II. Motions for Judgment of Acquittal ......................................... 696

III. Motions for New Trial–Common Issues ...................................... 698
 A. Refusal to Allow a Continuance of the Trial ................................. 698
 B. Conduct of Voir Dire ......................................... 699
 C. The Court Did Not Abuse its Discretion in the Handling of the Voir Dire ..... 703
 D. The Court Did Not Abuse its Discretion in Excusing Juror No. 11 ........... 705

IV. Kemp's Motions for New Trial—Applicable to Defendant Kemp .................. 708
 A. Kemp Has Not Shown Any Brady Violations Warranting a New Trial ......... 708
 1. Contentions of Defendant Kemp ...................................... 708
 2. Government's Contentions .......................................... 708
 3. Discussion ................................................... 708
 B. The Batson Challenges Were Properly Overruled .......................... 710
 C. The Undersigned Appropriately Denied Kemp's Motion for Recusal ......... 711
 D. Kemp Was Not Prejudiced by Denial of Severance of Offenses .............. 711
 E. The Court Did Not Deprive Kemp of a Fair Trial by the Ingrid
 McDaniels Rulings ............................................... 712

V. The Court Properly Revoked Kemp's Bail and Required Him To Start Serving
 his Sentence Immediately ............................................... 714

VI. Conclusion ................................................... 715

## I. *Introduction*

On June 29, 2004, a grand jury returned a 56 count indictment charging twelve individuals with various criminal activities, focusing on the conduct of Ronald White, Esquire, a Philadelphia lawyer, and Corey Kemp, who had been the Treasurer of the City of Philadelphia.

Count 1, by far the longest count in the indictment, charged six of the defendants with conspiracy to deprive the citizens of Philadelphia of the honest services of City

Treasurer Kemp. In addition, all of the defendants were charged with mail and/or wire fraud, perjury, and/or false statements to the FBI. Kemp was also charged with money laundering, extortion and tax evasion.

This Memorandum concerns the post-trial motions of the five defendants, all charged with conspiracy, who went to trial, beginning on February 14, 2005. Of the other defendants, Ronald White died prior to trial; Denis Carlson was acquitted of the charges against him of making false statements to the FBI; and five defendants entered guilty pleas.

This Memorandum has been prepared and filed following the sentencing of two defendants, Janice Knight, who was convicted of two counts of making false statements to the FBI, and Corey Kemp, who was convicted of conspiracy and 26 other substantive counts, but acquitted on eight counts. The jury was unable to agree on a verdict on the conspiracy charge against Knight and five counts against Kemp. However, three of the issues discussed below (trial date, voir dire and excuse of Juror No. 11), and decisions made following a hearing on July 18, 2005, arise out of pretrial and trial rulings, applicable to all defendants, and impact on portions of the motions for new trial of the other three defendants, LaVan Hawkins, Stephen Um-brell and Glenn Holck, albeit other grounds alleged by them that have not yet been fully briefed or argued.

There were extensive pretrial proceedings in this case. Shortly after the indictment, all of the defendants having retained counsel, the Court issued several Pretrial Orders ("PTOs") which are summarized in the chart below. In addition, the record will show that the Court had pretrial conferences approximately once per month following the return of the indictment, and that the trial date was a topic at all of these conferences. Conferences occurred on the following dates:

| Date | Docket No. of Transcript |
|------|--------------------------|
| July 20, 2004 | 57 |
| August 25, 2004 | 138 |
| September 14, 2004 | 151 |
| October 13, 2004 | 216 |
| November 23, 2004 | 288 |
| December 21, 2004 | 303 |
| January 24, 2005 | 414 |

Two of the above conferences (August 25, 2004 and September 14, 2004) included discussions between the Court and defense counsel out of the presence of the prosecutors. Sealed transcripts of those discussions are docketed at Nos. 139 and 154.

Also, during the pretrial proceedings and trial, the Court issued a series of orders and opinions (totaling over 200 pages) on various topics. Because these prior opinions will be referred to from time to time, but their contents not repeated, the Court will summarize them as follows:

| Date | Docket No. | Summary of Issues and Holdings | Defendants | Citation |
|------|-----------|--------------------------------|------------|----------|
| 7/23/04 PTO# 2 | 62 | Scheduling trial date for 1/12/05 | ALL | None |
| 7/23/04 PTO# 3 | 63 | Issuance of protective order concerning Title III materials, entered without objection. | ALL | None |
| 8/26/04 | 124 | In denying the government's motion to disqualify counsel for Defendant Hawkins, the Court held that no conflict of interest existed where counsel (Anthony Chambers, Esq.) represented one of Hawkins' employees when she testified before a grand jury. The Court held that only a potential conflict of interest existed, dependent upon whether or not the employee testified at this trial, and the issue could be avoided by having Hawkins' employee cross examined by Chambers' co-counsel. | Hawkins | 2004 WL 2102017 |

| Date | | Description | Defendants | Citation |
|---|---|---|---|---|
| 9/22/04<br>PTO# 5 | 153 | The government moved for a protective order to prevent defense counsel from disclosing discovery materials received from the government, other than Title III materials. Intervenor Philadelphia Newspapers, Inc. ("PNI") opposed the motion. The Court denied the motion, holding that the balancing of Pansy factors weighed against the issuance of a protective order. The most significant factor in the Court's decision was the fact that the government had released the materials at issue to the defendants without any restrictions. | ALL | 2004 WL 2399731 |
| 10/29/04<br>PTO# 8 | 224 | The Court denied Defendants' motions to dismiss the indictment. The Court held that the indictment sufficiently stated a theory of "honest services" mail or wire fraud under 18 U.S.C. § 1346. Specifically, the indictment was sufficient in alleging that Defendants Holck and Umbrell violated the "conflict of interest" prong of honest services fraud. The Court also denied Defendant Hawkins' motion to dismiss the perjury counts against him. | ALL | 2004 WL 2612017 |
| 12/2/04<br>PTO# 10 | 258 | The Court granted severance motions as to Defendants LeCroy, Snell and Carlson because these three defendants were not charged with participating in the conspiracy alleged in the indictment. Severance was denied as to the remaining defendants.<br>The Court also denied the motion for a bill of particulars, and on the issue of the trial date, the Court in prior pretrial conferences had required the government to produce discovery to the defendants in an electronically searchable form; the Court concluded defense counsel would be prepared to start trial in February 2005 and granted a short continuance from 1/12/05 for the start of the trial to 2/14/05 for the balance of the defendants. The Court scheduled the trial LeCroy, Snell and Carlson to begin on 1/18/05. | ALL | 2004 WL 2757867 |
| 12/17/04 | 294 | The Court held that certain notes and interviews were not subject to the protections of attorney-client privilege, and that Defendants LeCroy and Snell waived some protections of the joint defense agreement (JDA) by proceeding with interviews with their employer's counsel. The Court found that they had mutually agreed to modify the JDA or had voluntarily and knowingly waived the protection of the JDA to the extent that their employer had advised them it would turn over the notes of those interviews to the government, and these defendants proceeded with the interview with their employer's counsel. | LeCroy Snell | 348 F.Supp.2d 375 |
| 1/21/05<br>PTO # 13 | 369 | The Court denied PNI's motion for immediate unsealing of exhibits—consisting largely of Title III materials—attached to the Holck/Umbrell omnibus pretrial motion. The Court refused to release the material while the trial of Defendant Carlson was ongoing, but reserved a final decision on the matter until a hearing prior to the trial of the five conspiracy defendants. The Court ordered all trial exhibits, including the Title III materials, would be released prior to trial. | ALL | 365 F.Supp.2d 618 |
| 2/10/05<br>PTO # 15 | 438 | The Court refused to exclude from evidence, in the pretrial context, certain intercepted communications, ruling that the defendants' objections to the materials could be reasserted at trial, thereby giving the government an opportunity to develop evidence to demonstrate the admissibility of the disputed intercepted communications. | ALL | 2005 WL 352700 |
| 3/8/05 | 510 | The Court denied Defendant Kemp's motion in limine to preclude admission of certain marital communications. In refusing to preclude such communications, the Court found by a preponderance of the evidence that Mrs. Kemp had been agreeing to obstruct justice, and therefore the communications were not protected by marital privilege. | Kemp | Unreported |
| 3/11/05 | 514 | Defendant Hawkins filed nine motions in limine to exclude evidence regarding recorded conversations, co-conspirators' statements, inappropriate language, reference to a wedding | Hawkins | 360 F.Supp.2d 689 |

| | | | | |
|---|---|---|---|---|
| | | date, a letter, a meeting, defendant's financial status, and financial transactions. The Court concluded that Hawkins' Pizza Hut and Burger King relationships were admissible for the jury's consideration as to whether Hawkins had the motive or intent to join the conspiracy or commit wire fraud. The Court precluded the government from introducing "balance sheet net worth" as to Hawkins. | | |
| 3/18/05 | 529 | Concerning the defendants' position that the Court was obliged to hold a hearing under Fed.R.Evid. 104 as to the admissibility of co-conspirators' statements, the Court found near the conclusion of the government's case that the statements of Kemp, Hawkins and Knight, as alleged co-conspirators, would be admissible against each other pursuant to Fed.R.Evid. 801(d)(2)(E). A determination as to whether this ruling applied to Holck and Umbrell was postponed pending further argument. | ALL | 360 F.Supp.2d 697 |
| 3/29/05 | 548 | The Court granted the government's motion to preclude the admission of statements by the defendants that demonstrated "consciousness of innocence." The Court reasoned that defendants' assertions of innocence after they were confronted were self-serving, hearsay, and inadmissible under Fed.R.Evid. 803(3). The Court denied the government's motion to present evidence of certain Commerce Bank loans. Although the evidence was probative to show that the loan to Kemp was highly favorable, it would have opened the door to the defendants presenting additional evidence of loans, giving rise to potential jury confusion. | Holck Umbrell | 362 F.Supp.2d 591 |
| 4/21/05 PTO # 20 | 594 | The Court denied PNI's motion to unseal certain notes from the jury and denied PNI's motion to unseal the transcripts of the in camera voir dire of individual jurors. The Court reasoned that releasing this information to the public could have an adverse effect on continued deliberations and the ability of the jury to reach a verdict. The Court noted that the public interest in these materials would be served through a post-verdict unsealing. In camera attachment to Memorandum re: Trial Order No. 20 concerned notes from the jury and discussions with counsel concerning jury deliberations. | ALL | 366 F.Supp.2d 255 |
| 4/28/05 | 602 | The Court excused Juror No. 11 for bias and a refusal to consider evidence. The Court's excusal of Juror No. 11 was not based upon her nonconforming view of the sufficiency of the evidence, but rather, based on her harboring bias in violation of the Court's instructions and in violation of the juror's oath. | ALL | 2005 WL 1006348 |

## II. *Motions for Judgment of Acquittal*

Although both Kemp and Knight made motions for judgment of acquittal at the conclusion of the government's case and have renewed those motions after the verdict, they are not argued substantively and the Court finds that the evidence on all of the charges for which these two defendants were convicted was, without any doubt, sufficient.[1]

■ Defendant Knight was convicted of two counts of making false statements to the FBI. There were specific intercepted and recorded conversations between her and Ronald White, her paramour, in which she basically admitted that she had lied to the FBI; the evidence was sufficient, indeed uncontradicted, as to the materiality of her statements to the government's investigation.

---

1. The Court notes that the jury was unable to agree as to whether Ms. Knight was guilty or not guilty of the charge of conspiracy and a mistrial was granted. The government has indicated that it does not intend to retry Ms. Knight on the charge of conspiracy.

As to defendant Kemp, the Court can only characterize the evidence as overwhelming. The Court has previously summarized some of the evidence against Kemp in its Memorandum dated March 18, 2005, 2005 (360 F.Supp.2d 697), and will only note at this point a brief summary of the government's evidence.

The government's first two witnesses, Janice Davis, the former City Finance Director, and Folasade Olanipekun, the City Treasurer prior to Kemp, laid out in some detail the process by which the City conducted its financial affairs and detailed the duties and activities of the City Treasurer in the issuance of city bonds and in raising cash from time to time for general revenue needs or specific projects. White and Kemp concocted a scheme whereby White, recognizing the significant authority which the City Treasurer has in the selection of underwriters, bond counsel and other advisors to the City, purchased substantial control over the selection process of these professionals, by numerous, constant and substantial gifts given to Kemp.

Kemp was convicted of conspiracy to commit honest services mail and wire fraud, in violation of 18 U.S.C. § 371 (Count 1); 18 counts of mail or wire fraud, in violation of 18 U.S.C. §§ 1341, 1343, 1346 (Counts 2, 3, 9–14, 19, 21, 52–59); two counts of extortion and attempted extortion, in violation of 18 U.S.C. § 1951 (Counts 28 and 29); two counts of false statements to a bank, in violation of 18 U.S.C. § 1014 (Counts 46 and 47); and four counts of filing false tax returns, in violation of 26 U.S.C. § 7206(1) (Counts 60–63).

Kemp was found not guilty of eight counts of wire fraud (Counts 4, 5, 7, 15, 16, 22, 24, 25), one count of making a false statement to a bank (Count 45), and four counts of money laundering (Counts 48–51). The jury could not reach a verdict on five counts of wire fraud (Counts 6, 8, 17, 18, 23).

■ The government proceeded on the definition of honest services fraud set forth in prior opinions of the Third Circuit. *See U.S. v. Panarella,* 277 F.3d 678 (3d Cir. 2002), and the government's evidence proved both prongs of honest services fraud: (1) bribery, in which a benefit is given in exchange for a particular act or series of acts; and (2) failure to disclose, in which a public official accepts benefits which he is required by law to disclose, fails to make the disclosure, and then takes discretionary action to favor the giver of the benefit.

There was substantial evidence at trial of White arranging for Kemp to receive benefits (see below) in return for Kemp's acceptance of White's recommendations for the selection of various professionals to provide services to the City of Philadelphia, for substantial professional fees. There was also substantial evidence that Kemp failed to make disclosures of benefits, which he was required by law to disclose, and took discretionary action in favor of the person or entity that conveyed the benefit to him.

In support of the bribery theory, there were specific intercepted telephone communications where White and Kemp made agreements that because certain individuals did—or in some instances did not—make the requested contributions to either political activities or charitable activities, they were, or were not, going to receive City business.

The evidence also supported the jury finding that White was able to exercise this influence because Mayor Street had advised his Finance Director, and Kemp's predecessor as Treasurer, that White's recommendations should be given considerable weight in the selection of professionals.

The Court has reviewed the government's extensive (148 pages) review of the evidence it presented at trial. As the verdict winner, the government is entitled to this Court's reviewing the evidence in the light most favorable to the government. As to Kemp's and Knight's motions, the Court finds that the government's description of the evidence is accurate as to them and little would be served by a further detailed review of the evidence introduced at trial.

The evidence at trial showed:

(a) A stench floating over the office of Kemp, who, as Treasurer of Philadelphia, basically sold his office to Ron White and dispensed business and favors according to the directives of White and his own greed;

(b) Kemp's complete failure to adhere to state and city laws/regulations requiring the reporting of gifts and other benefits received by Kemp (as well as other City employees);

(c) Kemp's acceptance of numerous valuable gifts from White and others including:

1. Attendance at an NBA All–Star weekend;

2. Payment of $10,000 from White (albeit "laundered" through co-defendant Hawkins);

3. Attendance at a Super Bowl and USA basketball game;

4. A deck worth over $10,000 on his Reading home;

5. Numerous expensive lunches and dinners at specialty restaurants;

6. Additional expense-paid trips or substantive benefits.

(d) Kemp's greed did not stop when he walked out of his office door; he committed fraud against Commerce Bank at the same time he attempted to favor Commerce in getting City business, as White requested.

(e) Kemp defrauded his own church of funds it had received from Commerce Bank for renovations, with Kemp pocketing approximately $50,000 for his own personal benefit out of the Commerce Bank loan to the church;

(f) Kemp defrauded the state and also evaded taxes.

The evidence allows a characterization of White as a modern-day Mephistopheles, who enticed Kemp to sell his office (and perhaps his soul, as well), not for eternal youth—as promised to Dr. Faust—but with greed as the motive and wealth as the objective. But for the FBI Title III wiretaps, the scheme would probably have gone undetected.

## III. *Motions for New Trial–Common Issues*

Kemp has argued several different grounds for a new trial. The Court has identified four of these as being "common" issues raised by all of the defendants who went to trial and were convicted of various, albeit different, charges. The common grounds are the following: (a) refusal to grant a continuance; (b) alleged errors in the conduct of the voir dire; and (c) improper excuse of Juror No. 11.

The Court will deal with these matters seriatim.

### A. *Refusal to Allow a Continuance of the Trial*

■ The Court initially scheduled the trial for January 12, 2005, which was approximately six and one-half months following the indictment. This date reflected both the complexity of the case as well as the benefits that would accrue from the Court's Orders requiring the government to provide extensive discovery to defense counsel in an electronically searchable format. Indeed, many of the discussions at the pretrial conferences touched upon the

computer-based formatting of the government's production of discovery and the Court's requirement that defense counsel retain and employ adequate assistance in receiving and using this discovery in a timely fashion.[2]

Because Mr. Chambers, counsel for Hawkins, had another multi-month trial commitment starting in April 2005, the only alternative to the January 2005 trial date was, as urged by a number of the defense counsel, a trial date in the fall of 2005. This would have been over 14 months after the return of the indictment, which the Court concluded was against the public interest and the principles underlying the Speedy Trial Act, particularly in a public corruption case. Several of the memoranda issued by the Court, and listed above, discuss and justify the Court's selection of the trial dates.

Nonetheless, after the Court granted a severance of three of the defendants,[3] the Court decided that the trial of the three severed defendants would proceed first, close to the original trial date, on January 18, 2005, and this would allow defense counsel for the remaining defendants an additional four-plus weeks to prepare for trial, which was postponed to February 14, 2005. Later, a further concession was made to defense counsel, who were still seeking more time, by agreeing that although the jury selection would begin as scheduled on February 14, 2005, the trial would be adjourned after the jury was selected, and arguments and testimony would not begin until February 22, 2005.

Under all of the circumstances, the Court finds that no defendant was denied due process. The selection of the trial date and the rulings on defense motions for a continuance were carefully considered and fully within the trial court's discretion. The best evidence against the defendants' argument is the conduct of the trial itself. All defense counsel were exceptionally well prepared, conducted vigorous cross examination of the government's witnesses, made legal arguments virtually every day after the jury was excused, and represented their clients in an expert and professional manner—all of which belie any lack of time for preparation.

### B. *Conduct of Voir Dire*

The next ground for new trial relates to the conduct of the voir dire. Before discussing the specific contentions of the defendants, the Court describes briefly how the voir dire process was conducted in this case. Because of the extensive publicity about the case, a special venire was called, consisting of over 200 potential jurors.

The Court circulated proposed voir dire questions on Monday morning, February 14, 2005, and had a session with counsel and defendants in the courtroom before speaking to the jury venire. At that time, a number of attorneys made various suggestions, some of which were rejected and some of which were accepted. Defendants requested seven peremptory strikes each; the Court allowed Defendants four each, or a total of twenty. The government was allowed ten. The Court would select twelve jurors plus four alternates. The Court reiterated its opposition to the use of the questionnaire, but indicated that the use of individual voir dire—allowing counsel to ask questions following answers to

2. *See* the Court's Memorandum dated December 2, 2004. All of the defendants, except for Kemp, had privately retained counsel and no one objected to the cost associated with computer-based retrieval of discovery from the government. Although Kemp had appointed counsel, the Court allowed Kemp to retain an information technology expert to assist counsel in this endeavor.

3. *See* Order dated December 2, 2004 (Docket No. 258).

the general questions—would give all counsel an opportunity to probe into any difficulties that any of the members of the venire would have in following instructions or in serving on the jury.

The entire venire was seated in the Ceremonial Courtroom at 601 Market Street. After consultation with defense counsel, the Court asked the entire venire a series of general questions, answerable yes or no, about their own (or close friends' or family members') prior relationships with, e.g., law enforcement officers, the criminal justice system, the federal government and banks. If any person had an affirmative answer, he or she raised their hand. After questions were asked in this manner, 79 jurors appeared individually in the trial courtroom. All these venire persons were asked if they had any knowledge or opinion about the case from pretrial publicity, and also whether they would suffer any hardship from serving on the jury, given the length of time that was forecasted for the trial (6 to 8 weeks). Individuals who raised their hand for any reason were also questioned, initially by the Court and then by counsel on a rotating basis, as to the reason why they raised their hands as well as other matters.

Due to some unavoidable delays in starting the overall voir dire process on Monday, February 14, 2005, the individual voir dire in the trial courtroom did not begin until sometime between 11:00 a.m. and 12 noon. (The transcript does not show the time at which various events took place, and the recollection of counsel and the Court on this point varies between 11:00 a.m. and 12 noon.)

On February 14, the Court encouraged defense counsel to form a consensus, if possible, but in the absence of consensus on peremptory challenges, each defendant would have to exercise individually his or her four peremptory challenges. N.T. at 47. The government was allowed ten challenges; thus, each time the government exercised a strike, there would be two defense strikes before the striking sheet would be returned to the government. N.T. at 280.

At the end of the day on February 14, it appeared that the process was moving quickly. Relatively few people had opinions about the case as a result of publicity and a relatively small number were claiming hardship. Several people who had questions about personal situations were encouraged to check to see if they could make arrangements and serve on the jury. The individual voir dire went smoothly and all counsel were responsible in asking questions. Defense counsel's argument that they were surprised, at the close of the individual voir dire on the following day, that they had to exercise their peremptory challenges quickly is unsupported by the record. The Court made it clear by the following comment that the peremptory strikes should be formulated during the lunch break on the following day:

> THE COURT: Let's see how we do tomorrow morning. If so, we will just get some more people. But I agree, it is moving smoothly.
>
> What I would like to do is finish the questioning and then, if you want, I will take a lunch break, then even if it is early, so you can start thinking about your strikes over the lunch break. And then we come back and do the strikes and then swear the jury and excuse them. If that is agreeable with everyone.
>
> MR. LUSTBERG: That sounds good, judge.

N.T. 2/14/05 at 279–80.

The voir dire process continued on Tuesday, February 15, 2005, but a larger number of jurors had various problems with serving on the jury. Before the lunch break, the Court indicated to counsel that

it was important to conclude the voir dire on that day and that the voir dire would be complete when 46 jurors were available for strikes. N.T. at 198. After lunch, the Court reiterated the need to complete the voir dire on February 15, 2005, because of a meeting of the committee working on Third Circuit jury charges in criminal cases. *Id.* at 200.

On Tuesday, February 15, 2005, the voir dire of additional panel members, sufficient to allow for excuses, challenges for cause and the exercise of the thirty peremptories that had been allocated, was completed at approximately 3:15 p.m. At that point, all of the 79 jurors who had been in the individual voir dire were brought into the trial courtroom and seated in numerical order. As they had requested, defense counsel gathered in the jury room so they could more easily and privately discuss their peremptories, with government counsel seated in a nearby separate room. The "strike sheet," where counsel would strike those jurors peremptorily challenged was to be passed back and forth between the two sides.

At 3:25 p.m., following the completion of the voir dire, with 47 "hardship-free" jurors available for strikes, the Court advised counsel that a recess would be taken for all of the jurors who had been questioned to return to the trial courtroom so that the striking process would proceed. The Court told counsel that it would advise the jurors that the lawyers would work on the jury selection in an adjacent room, but that the process would take approximately one-half hour, and that the jury would be seated no later than 4:15 or 4:20 p.m. The Court then stated, "so that is the plan. Any comments?" No lawyer objected to the inadequacy of the amount of time that was allowed. At that point, a recess was taken for counsel to begin their discussions and for the Court staff to bring up to the trial courtroom all of the jurors who had

been subject to individual voir dire. *See* N.T. 2/15/05 at 310–17. Additional questions were asked as to whether any of the jurors wanted to change their prior answers and whether they would be able to follow instructions on the law; no juror raised their hand or indicated affirmative answers to either of these inquiries. The jurors were then told as follows:

> Now, what's going to happen is, the lawyers and the defendants are going to go out into the rooms. They are going to do the jury selection process outside, back in the jury room, in one of the rooms out there. They may come in from time to time just to check up on who is who, where you are seated, things like that. This process will take no more than a half hour. So please sit tight.

(N.T. 2/15/05 at 317.)

No defense lawyer made any objection at this time to the Court's ruling concerning the amount of time that would be allowed.

At approximately 3:45 p.m., defense counsel went into the jury room and the prosecutors went to a different room outside the courtroom and the 79 jurors stayed in the courtroom. At approximately 4:15 p.m. the Court was advised that there was a *Batson* challenge. The Court went into the jury room and ruled on the matter and inquired as to how the striking process was going. Defense counsel said they were proceeding, but that they needed additional time. The Court allowed an additional fifteen minutes, which defense counsel said was not sufficient. *Id.* at 322. At approximately 4:30 p.m. the Court was advised by the deputy clerk that defense counsel needed another ten minutes by which time they would have completed the striking process; the Court allowed this. (N.T. at 323.)

At approximately 4:38 p.m., the Court was advised of another *Batson* challenge and went into the jury room. At this point, while waiting for government counsel for the *Batson* challenge, the Court asked defense counsel whether they had completed all the strikes. Counsel for defendant Holck, who had previously objected to the Court's time limits, stated "we have our list of our strikes." Counsel for defendant Knight said "we have the list; we have to formalize it." The Court indicated that a number of jurors needed to catch a bus at 5:15 p.m. and that the Court was going to oblige them. Counsel for defendant Umbrell said, "We can do it." (N.T. at 324.)

After the Court overruled the *Batson* challenge, N.T. at 325, counsel for defendant Holck said "we have the rest of our challenges," whereupon the Court stated that all counsel were going to come into the courtroom and finalize their strikes in the courtroom. *Id.* at 325–26.

At approximately 4:45 p.m., the attorneys came into the courtroom as directed by the Court. This was ninety minutes after completion of voir dire. However, the Court learned that defense counsel had not completed their strikes on the striking sheet even though they had represented that they would have done so by this time. The government attorneys had completed their strikes. Defense counsel gathered at the podium and the Court instructed Mr. Tinari, who appeared to be the defense counsel in custody of the striking sheet, to make the strikes forthwith. There was still some delay in getting this accomplished. N.T. at 326. This process was completed at approximately 4:50 p.m. and the Deputy Clerk began seating the jurors. N.T. at 328. At this time, Mr. Chambers, counsel for Defendant Hawkins, asked to see the Court at sidebar. Although initially reluctant to have a sidebar, the Court met with Mr. Chambers at sidebar. Mr.

Chambers indicated that one juror, who had been seated, had been stricken by Defendants and should not have been seated. The juror was taken out of his seat in the jury box, and the other jurors moved up one seat and the next venire person who had not been stricken was seated. N.T. at 332.

After all jurors had been seated, the Court asked, "Is the jury satisfactory to the defendants?" Counsel for Holck said, "Yes." The Court asked, "Anybody object to the jury?" No counsel objected at that time. N.T. at 333.

After the jury was sworn and excused, there was additional colloquy on the record about the process. The undersigned acknowledged that he had been "frustrated" by the process, and noted that defense counsel were being assisted by a jury consultant. N.T. at 349–50. In formulating their peremptory strikes, the colloquy quoted above shows that defense counsel had determined which venire persons to strike, which belies the objections made subsequently and in the post-trial motions.

All in all, the Court finds that the jury selection process was fair and that ample time had been allowed for defense counsel to consider and make their peremptory challenges. As the Court noted at the time, it appeared from the overall facts, that in attempting to use the "consensus" approach to strikes, there was a disagreement among defense counsel as to what individuals should be stricken, and this caused the delay. N.T. at 323. The Court cannot agree that the Court denied defendants their rights or that any defense counsel or defendant was embarrassed or in any way prejudiced by the colloquy that took place in the final ten minutes.

The Court finds that defense counsel abused the privilege which they had requested, of using the jury room to conduct their discussions and strikes in private.

If, as is the usual procedure, defense counsel had remained at counsel table in the courtroom, the Court could have observed progress, or lack thereof, in making strikes and passing of the strike sheet between defense counsel and the government, as these acts would be in public. The Court accommodated defense counsel by permitting use of the jury room, believing that it would expedite the process and allow them to confer in private in an effort to reach a consensus. The Court did not know of the apparent lack of agreement because defense counsel were meeting privately in the jury room and represented that they had decided on their strikes. Even when defense counsel returned to the courtroom, the Court specifically directed that the strikes had to have been completed, by which it meant marking the strikes on the strike sheet. In view of the prior representation by defense counsel, the Court was surprised to learn that the peremptories had not yet been completed, which led to the dialogue between counsel and the Court, which defense counsel have criticized, inaccurately and unjustifiably, in their motions for new trial.

## C. The Court Did Not Abuse Its Discretion in the Handling of the Voir Dire

All parties acknowledge that a trial court's rulings on the conduct of voir dire are within the discretion of the trial court. Nonetheless, counsel must have the opportunity to exercise peremptory challenges in a fair manner. The Third Circuit recently took up this issue in *United States. v. Adedoyin,* 369 F.3d 337 (3d Cir.2004), a case in which the defendant was of African origin and was concerned that the events of September 11, 2001 would prevent him from having a fair trial. The Third Circuit held as follows:

> The Supreme Court has "stressed the wide discretion granted to the trial court in conducting voir dire in the area of

pretrial publicity and in other areas of inquiry that tend to show juror bias." *Mu'Min v. Virginia,* 500 U.S. 415, 427, 111 S.Ct. 1899, 1906, 114 L.Ed.2d 493 (1991). The trial court here exercised its discretion with great care and determined that Adedoyin could receive a fair trial in the wake of the September 11th terrorist attacks.

Most appellate cases discussing voir dire, and those cases reversing convictions because of improper voir dire, concern the exclusion of jurors from the process for improper reasons. For example, in *United States v. Salamone,* 800 F.2d 1216 (3d Cir.1986) and *United States v. Calabrese,* 942 F.2d 218 (3d Cir.1991), the Third Circuit reversed convictions because of the exclusion of numerous jurors on improper grounds without conducting individual inquiries, thereby denying the right to a "fair cross-section of society in the juror pool" and potentially prejudicing the defendant.

In *Calabrese,* the defendant was convicted of several drug-related offenses. On appeal, the Third Circuit vacated the appellants' convictions and remanded to the district court for new trial because the trial judge abused his discretion in conducting voir dire. The defendant asserted that the district court abused its discretion because it was unaware that, of 167 potential jurors for which the court signed a "blanket excusal," 12 of them were excused for having admitted to knowing one of the defendants. 942 F.2d at 221–22. Because the jurors were not questioned beyond the mere knowledge of a defendant, the trial court could not have determined whether the bias for which the jurors were removed was applicable to any or all of them. *Id.* at 226. The Third Circuit acknowledged that it does not want to

> disturb the substantial amount of discretion granted a trial judge in decisions to

excuse a potential juror on the grounds of actual bias, at any stage of the proceedings....

*Id.* at 227.

Similarly, in *Salamone*, the defendant's counsel objected to the summary dismissal of National Rifle Association ("NRA") members because "the trial judge simply assumed that any person connected with that association was incapable of fairly applying existing law." 800 F.2d at 1222, 1224. The Third Circuit, vacating the defendant's conviction, held that the district court abused its discretion by excusing all members of the NRA during voir dire for the sole reason of their affiliation with NRA, without conducting further inquiry.

> [V]oir dire plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled.

*Id.* at 1223–24.

No defendant disputes the adequacy of the voir dire in this case, and none has cited any cases discussing improper time limits for the exercise of peremptories, as warranting a new trial. Moreover, the facts of the voir dire in this case show that there is nothing similar to what took place in *Salamone* or *Calabrese*.

■ Notwithstanding the above limited selections from Third Circuit jurisprudence on voir dire, the Supreme Court recently changed the legal landscape on the significance of peremptory challenges in *United States v. Martinez–Salazar*, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000). In this landmark case, the Court held that a denial of the right to exercise peremptory challenges is not grounds for any relief unless a juror who was subject to challenge for cause is seated on the jury. The Court held that because the defendant received the peremptory challenges to which he was entitled under Rule 24(b), he did not have any claim for relief, commenting that "a hard choice is not the same as no choice."

That defendants do not assert that any juror who should have been dismissed for cause was placed on the jury, or that anything in connection with the exercise of peremptory challenges had a cause-and-effect relationship on a juror subject to a challenge for cause being placed on the jury. Indeed, all challenges for cause and all excuses for hardship or other reasons were identified and decided before the peremptory challenge procedure began; all counsel were aware of which jurors were excused for cause or otherwise, and they were to be "passed over" during the peremptory challenge striking. Thus, the Court finds that under *Martinez–Salazar* defendants are not entitled to any relief because of the Court's limiting the amount of time available for peremptory challenges. The defendants cite this important case only in passing, and they do not acknowledge its precise holding which this Court believes precludes relief.

This discussion would not be complete without noting that defendants' argument assumes a certain amount of naiveté on the part of a reviewing court. Defendants pretend that the task of making peremptory challenges was thrust upon them at the very end of the voir dire on the afternoon of February 15, 2005, and that they were given less than one hour to make their challenges, an insufficient time given the importance of the selection of the jury. This argument belies the facts and belies the reality with which competent criminal defense counsel approach the voir dire process. The truth of the matter is that all counsel, prosecutors and defense counsel, had most of two days to go through

this voir dire process. From the first address to the jury on Monday morning, February 14, through the completion of voir dire, defense counsel had the entire venire of specific jurors in front of them. The Court must conclude, based on the realities of the practice of jury selection, that from the first minute to the last, every lawyer was considering each juror, either as part of a group, or as they individually appeared in the courtroom for individual voir dire, as a potential juror, and determining whether or not they should have been peremptorily stricken on behalf of their own client when the time came for strikes.

#### D. *The Court Did Not Abuse its Discretion in Excusing Juror No. 11*

The undersigned has previously has previously made findings on this issue in two Memoranda, the first dated April 20, 2005 and sealed until the return of the verdict, and the second dated April 28, 2005, on the excuse of Juror No. 11, and also made oral factual findings on April 28, 2005 on completion of the voir dire.

At oral argument on July 18, 2005, defense counsel presented over three hours of argument on the Juror No. 11 issue in addition to written briefs.

■ Defendants assert that the Court improperly delved into jury secrecy and allowed the jury to reveal the content of deliberations. First, defendants contend that the Third Circuit's decision in *United States v. Resko,* 3 F.3d 684 (1993), mandating juror voir dire, only applies in cases of juror misconduct during the trial, as were the facts in that case, where one of the jurors complained that other jurors were deliberating during the trial. Defense counsel agree that a juror's outright refusal to deliberate may also warrant a court's inquiry under *Resko.* However, they contend that, because of concerns for jury secrecy, neither *Resko,* nor any other

Third Circuit case, or any other appellate case, would allow the type of voir dire that this Court undertook.

The Court rejects this interpretation of *Resko,* and finds that the authorization of juror voir dire in *Resko* applies to the conduct of deliberations. Otherwise, it would be impossible to draw a line between certain types of juror misconduct— e.g., an outright refusal to deliberate—and other types of juror misconduct, such as refusal to follow deliberations, or a demonstration of outright bias. Furthermore, the other circuit cases relied upon for the excuse of Juror No. 11 all involved juror voir dire. Specifically, in *United States v. Thomas,* on which defendants most heavily rely, the court specifically upheld the use of juror voir dire when the trial judge received reports that a deliberating juror was intent on defying the court's instructions on the law. 116 F.3d 606 (2d Cir. 1997) (upholding the right of a trial judge to excuse a juror engaged in nullification but reversing the conviction because the juror's discharge stemmed from the juror's view of the sufficiency of the government's evidence). *Thomas* held that the court "would generally need to intrude into the juror's thought processes. Such an investigation must be subject to strict limitations. Without such an inquiry, however, the court will have little evidence with which to make the often difficult distinction between the juror who favors acquittal because he is purposely disregarding the court's instructions on the law, and the juror who is simply unpersuaded by the government's evidence." *Id.*

In this case, this Court reviewed *Thomas,* recognized the distinction drawn by the above language, and carefully tailored the voir dire questions so as not to intrude on juror secrecy. The Court determined that settled law authorized the voir dire, and it was limited as required by *Thomas.*

In *Thomas,* the court specifically held that a voir dire may be conducted if it comes to the trial court's attention, during the course of deliberations, that a juror is refusing to follow the court's instructions on the law and who threatens to "undermine the impartial determination of justice based on law." *Id.* at 617. Such a conclusion "reinforces the court's inherent authority to conduct inquiries in response to reports of improper juror conduct and to determine whether a juror is unwilling to carry out his duties faithfully and impartially." *Id.*

■ In the present case, the Court found that Juror No. 11 was refusing to follow the Court's instructions because the record shows that she was biased against FBI agents because of their employment, which was specifically contrary to the Court's instructions. *See* N.T. 4/12/05 at 263.

The defense position is also rejected in the decision in *United States v. Abbell,* 271 F.3d 1286 (11th Cir.2001), where the court learned of one juror who reportedly was refusing to follow the jury instructions during deliberations, conducted a voir dire, and excused the juror. In applying the rule in *Thomas,* the court there held that this standard was basically a "beyond reasonable doubt" standard and that the question of whether a juror is purposely not following the law is a finding of fact that is reviewed for clear error. 271 F.3d at 1302–03. The court thus affirmed the conviction.

Defendants assert that even assuming the concept of the voir dire was permissible, the questions were too broad, and contend that in the third voir dire the Court's allowing some of the jurors to expand on their answers was improper to the extent that it intruded into jury secrecy and revealed jury deliberations.

The Court rejects this accusation as unfounded by the record. On numerous occasions, and specifically as each juror was questioned during the voir dire, the Court explicitly said that it did not want any juror to reveal his or her own vote or how the jury as a whole stood on the issues of guilt or innocence. After the conclusion of all three voir dires, neither the Court nor counsel had any idea where the jury stood as to guilt or innocence as to any defendant or as to any count or counts. The questions were narrowly tailored to determine if juror misconduct existed.

The circuit legal precedents dealing with this issue are few in number; the applicable rule adopted by all the circuit courts that have considered this issue is generally the same, albeit sometimes expressed in different language: a juror may not be removed for a non-conforming view of the evidence, but only for refusal to perform their duty as a juror by deliberating together with the other jurors.

All of the cases give the trial court discretion, particularly where, as here, detailed findings of fact have been made. *Thomas* specifically held that the district court's finding as to whether a juror impermissibly refused to participate in the deliberation is a "finding of fact to which appropriate deference is due," and discretion is also due because the trial judge's conclusion is "based in large measure upon personal observations [of the juror's behavior] that cannot be captured on a paper record." 116 F.3d at 130.

Having carefully reviewed the argument and briefs filed on this issue, and without repeating the findings and legal discussions in the opinions referred to above, the Court concludes:

1. The voir dire of the jurors was appropriate under *Resko, Thomas* and other cases.

2. Once the Court followed the *Resko* procedure, then the decision on excuse of

Juror No. 11 was fully within the trial court's discretion and the exercise of that discretion was in accord with all of the cases cited by the parties.

3. The Court seriously considered whether to excuse Juror No. 11 after the second voir dire but did not do so, hoping that the supplemental instructions and the answers given to the jury notes would have resulted in Juror No. 11 following her oath and participating in deliberations.

4. The Court acted to excuse Juror No. 11 only after additional notes were received and the third voir dire took place.

5. The jury at no point said that it was deadlocked; indeed, it appears from the final verdict issued nine days after Juror No. 11 was excused and replaced with one of the alternates, that the jury agreed to disagree as to some counts in the indictment and came to a combination of guilty and not guilty verdicts as to all of the defendants on other counts. This fact belies defendants' arguments that the Court excused Juror No. 11 to favor the prosecution.

6. This Court's findings were based upon careful examination of all of the jurors on all three separate occasions of the voir dire.

7. Juror No. 11 was not excused because of her non-conforming view of the evidence.

8. The excuse of Juror No. 11 was not a material circumstance depriving any of the defendants of a fair trial. By replacing Juror No. 11 with an alternate, all parties received a verdict by twelve jurors selected through the original voir dire process; defendants had no absolute or constitutional right to a verdict from the original twelve jurors, even after deliberations had begun.[4]

9. In this case, the facts showed that Juror No. 11 was refusing to consider evidence, refusing to follow instructions, and in addition, was biased. She was violating her oath and there were several independent reasons to excuse her.

10. Although the defense's review of the record minimizes the impact of the legal significance of the various notes from the jury, and the propriety under *Resko* for voir dire, the careful examination of each of the notes and voir dire show that the jury was indeed stymied in continuing its deliberations, although not deadlocked as to a verdict. This distinction is important and warranted the Court's voir dire on each of the three occasions, and the eventual excuse of Juror No. 11.

11. Even if the Court's inquiry, or the Court allowing some of the jurors' responses to the Court's questions, involved some exposure of the jurors' deliberations, the Court finds harmless error beyond a reasonable doubt. In *United States v. Baker*, 262 F.3d 124 at 132, the Second Circuit upheld the voir dire employed by the trial judge (with a different juror issue than in the present case), finding that the trial judge should not have asked some of the jurors about the conduct of their deliberations, but that this error was not an abuse of discretion requiring reversal.

---

4. *See United States v. Hillard,* 701 F.2d 1052 (2d Cir.1983); *see also Claudio v. Snyder,* 68 F.3d 1573 (3rd Cir.1995) (affirming denial of habeas corpus relief where the trial judge had replaced an ill juror after deliberations began, in violation of state law, but which was found to be harmless error):

Most of the federal courts that have addressed the issue ... have held that when circumstances require, substitution of an alternate juror in place of a regular juror after deliberations have begun does not violate the Constitution, so long as the judge instructs the reconstituted jury to begin its deliberations anew and the defendant is not prejudiced by the substitution.

*Id.* at 1575 (citations omitted).

## IV. *Kemp's Motions for New Trial—Applicable to Defendant Kemp*

### A. *Kemp Has Not Shown Any Brady Violations Warranting a New Trial*

#### 1. *Contentions of Defendant Kemp*

Defendant Kemp asserts that the government violated its obligations under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to produce in a timely fashion the FBI 302 report of David Eckhart, who according to the government's evidence, provided Kemp with the use of a limousine, supposedly to gain favors with Kemp, as his firm did business with the City. The government rested its case on Friday, April 1, 2005 without calling Eckhart, and informed Kemp of the existence of the Eckhart 302 report on Monday, April 4, 2005. Kemp asserts that the government only came forward with the Eckhart 302 report because counsel for Kemp stated in court on April 1st that he had spoken to Eckhart and learned of the several FBI interviews of Eckhart. (Kemp Rule 29 Memorandum at 14.) Kemp asserts that Eckhart, one of the principals of the investment firm, IMAGE, which did business with the City, told FBI investigators that he did not believe that Kemp had any power and that he did not expect anything from Kemp in exchange for providing Kemp the use of a limousine.

#### 2. *Government's Contentions*

With respect to the statements made to the FBI by David Eckhart,[5] the government acknowledges that, if true, the statements may be construed as exculpatory. However, the government asserts that the evidence at trial strongly suggests that the exculpatory statements were not true and, moreover, that Eckhart was motivated to deny Kemp's influence in order to avoid his own potential criminal liability. (Gov't Resp. to Def. Kemp's Post–Trial Motions at 208.) Specifically, the government notes that both Kemp's predecessor, Folosade Olanipekun, and supervisor, Janet Davis, contradicted Eckhart's statement to the extent that both witnesses testified that Kemp was a decision-maker with power to recommend participants in financial deals and negotiate their fees. (*Id.* at 210)

While acknowledging that the Eckhart 302 report was not turned over until after the government rested, the government contends that the defense still had an opportunity to use the evidence at trial (*Id.* at 208.) The government also contends that Eckhart's opinion, by itself, that Kemp was not a decision-maker, would likely have been inadmissible at trial. (*Id.* at 210.) Lastly, the government stresses that had Eckhart been called to testify, he very likely would have asserted his right against self-incrimination. (*Id.*)

#### 3. *Discussion*

■ In *Brady v. Maryland*, the Supreme Court of the United States established the principle that prosecutors have a constitutional duty to disclose impeaching or exculpatory evidence in their possession to a criminal defendant. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). A failure to do so results in a violation of the defendant's due process right to a fair trial. *United States v. Higgs*, 713 F.2d 39, 42 (3d Cir.1983) (reversing district court's order compelling government to release names of witnesses

---

5. Eckhart told the FBI, in part, that the use of the limousine "costs him nothing" and he saw nothing wrong with allowing Kemp the use of the limousine. He said he did not view Kemp as a decision maker in City government and he was not aware of City rules which prohibited Kemp from accepting the use of the limousine.... He said that at no time did he expect anything in return from Kemp. (Eckhart 302 Rep. at 6)

a week before trial). The Third Circuit recently summarized the criteria necessary to establish a *Brady* violation. In *U.S. v. Pelullo,* the Third Circuit stated:

In *Brady v. Maryland,* the Supreme Court held that due process forbids a prosecutor from suppressing "evidence favorable to an accused upon request ... where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." To establish a due process violation under *Brady,* then, a defendant must show that: (1) evidence was suppressed; (2) the suppressed evidence was favorable to the defense; and (3) the suppressed evidence was material either to guilt or to punishment.

*U.S. v. Pelullo,* 399 F.3d 197, 209 (3d Cir. Feb.25, 2005) (reversing district court's grant of new trial) (internal citations omitted).

The term "favorable" has been defined by the Supreme Court as meaning "exculpatory" or "impeaching" evidence. *See U.S. v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (noting that impeachment evidence as well as exculpatory evidence, falls within the *Brady* rule); *see also Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (affirming judgment of court of appeals and noting that "the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching"). The Third Circuit has explained:

Exculpatory evidence includes material that goes to the heart of the defendant's guilt or innocence as well as that which might well alter the jury's judgment of the credibility of a crucial prosecution witness. Evidence impeaching the testimony of a government witness is exculpatory when the credibility of the witness may be determinative of a criminal defendant's guilt or innocence. If the

exculpatory evidence "creates a reasonable doubt" as to the defendant's culpability, it will be held to be material. *U.S. v. Starusko,* 729 F.2d 256, 260 (3d Cir.1984) (vacating district court's order precluding testimony of government witness as a sanction for the government's failure to disclose exculpatory evidence because although the evidence was both exculpatory and material, there was no prejudice).

█ Further review of the controlling Supreme Court and Third Circuit case law reveals that favorable evidence is "material" if there is a "reasonable probability" that, had it been disclosed earlier, the result would have been different. *See Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (reversing conviction and remanding for new trial because omitted evidence could have resulted in different verdict) (citing *U.S. v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)); *U.S. v. Perez,* 280 F.3d 318 (3d Cir.2002) (affirming convictions). However, the Supreme Court cautioned:

The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles,* 514 U.S. at 434, 115 S.Ct. 1555 (quoting *Bagley,* 473 U.S. at 678, 105 S.Ct. 3375). The parties agree that, when disclosure of the evidence comes during the trial, the test for materiality is whether the defendant suffered any prejudice and whether the "exculpatory evidence can be effectively presented at trial and the defendant is not prevented by lack of time to

make needed investigation...." *U.S. v. Kaplan,* 554 F.2d 577, 580 (3d Cir.1977) (affirming defendant's conviction); *see also Strickler,* 527 U.S. at 282, 119 S.Ct. 1936 (requiring prejudice to show a *Brady* violation).

Third Circuit case law also suggests that evidence is not material if it is not admissible or credible. *See U.S. v. Perez,* 280 F.3d 318, 349–350 (3d Cir.2002) (affirming convictions and discussing cases). In addition, there is case law that suggests that, even though a defendant has no burden of proof in a criminal trial, "deliberate inaction" in the face of obvious error may constitute a waiver of a defendant's right to allege an error on appeal. *See U.S. v. Harris,* 498 F.2d 1164 (3d Cir.1974) (affirming convictions). In *Harris,* the Third Circuit stated:

> Although the judge plays a vital role in the trial of a criminal case, counsel for the parties are also essential components. They too share in the cause of justice. When error appears in a trial and counsel have opportunity to attempt to eradicate it but choose not to do so, they may not unload the burden of the error upon the trial judge. Defense counsel sat by in this case day after day without making the slightest effort to minimize the prejudice of which they now complain. The Government was slow in correcting the testimony of its key witness. Defense counsel, however, in the expectation that any ensuing conviction would be reversed, did nothing to take obvious corrective measures. We do not believe they may now profit from their inactivity and contend on appeal that the defendants are entitled to a new trial.

*Id.* at 1170–71; *see also United States ex rel. Paxos v. Rundle,* 491 F.2d 447 (3d Cir.1974) (vacating judgment of district court granting writ of habeas corpus because prosecutor had timely informed defense counsel of his discoveries and defense counsel could have applied to reopen the record before closing arguments).

■ Assuming arguendo that there was a *Brady* violation, because of the circumstances set forth above, any prejudice to the defendants was ameliorated, if not removed, by the Court's offer on April 4, 2005 to continue the case, for a defense interview of this witness, or other action. The Court offered to subpoena Eckhart for examination by defense counsel, initially out of the jury's presence, an offer which Kemp's counsel declined. *See* N.T. at 80–84. Kemp's counsel also declined an offer to postpone the trial.

■ Lastly, it is important to note that once a *Brady* violation is found, because prejudice and materiality are incorporated into whether there has been a *Brady* violation, a harmless-error inquiry is inappropriate. *See Kyles,* 514 U.S. at 436, 115 S.Ct. 1555; *see also Strickler,* 527 U.S. at 281–82, 119 S.Ct. 1936 (distinguishing between *Brady* material and a *Brady* violation).

The parties have not made a harmless error argument. In view of the overwhelming evidence against defendant Kemp, the Court believes that the failure to turn over the Eckhart 302 before the government rested was indeed harmless error beyond a reasonable doubt.

### B. *The Batson Challenges Were Properly Overruled*

Defendant Kemp argues that his challenges to government peremptories of two jurors, Nos. 7 and 59, should have been sustained.[6] As to Juror No. 7, the *Batson*

---

**6.** In reviewing the evidence, the Court has taken into account the two recent Supreme Court decisions on *Batson, Johnson v. California,* —— U.S. ——, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005) and *Miller-El v. Dretke,*

challenge was obviously properly rejected, although it was before all of the parties and counsel were aware of her erratic and improper conduct in the jury selection room, while the individual voir dire was proceeding. *See* N.T. 2/22/05 at 7–14, 39–67. If Juror No. 7 had been selected, her conduct would have warranted removal from the jury.

■ As to juror no. 59, this juror said she had "bias opinion," and she hesitated in answering a significant number of questions as to whether she could be fair and impartial because of unfortunate situations that involved her family, including the murder of her son, where the "system" had "failed." N.T. 2/15/05, 180–196. Although she eventually said that she could put aside these opinions, her status as a qualified juror was questionable and there can be no criticism on racial grounds of the government's exercising one of its peremptory challenges as to her.

Kemp's brief does not present any precedent giving legal support to his *Batson* contentions.

## C. *The Undersigned Appropriately Denied Kemp's Motion for Recusal*

■ After the verdict had been recorded, the Court made some remarks on the record concerning the evidence that had been introduced in the case, but specifically said that the remarks had nothing to do with the "guilt or innocence" of any individual defendant. N.T. 5/10/05 at 23. The discussion was more on the significance, to the jurors as citizens, of the important civic lessons which this trial displayed, including the ignoring of state and local laws requiring the reporting of gifts and other benefits, and in consideration of whether additional laws or civil enforcement proceedings should be brought to deter some

of the conduct that had been admitted during the trial testimony.

First, because the Court's comments were after the verdict, they could not possibly have been prejudicial. Second, the comments do not reveal any bias or prejudice against any of the defendants in this case. Third, the comments were purely that, the Court's expressing an opinion on the eight weeks of testimony—but not on guilt or innocence of any defendant—detailing a breakdown in the enforcement of laws and regulations concerning the non-reporting of the undisputed largesse that flowed to many City employees from individuals and entities seeking City business.

The Court's comments were during judicial proceedings and after the jury verdicts had been recorded. There is no legal support whatsoever for Kemp's position, and *Liteky v. United States,* 510 U.S. 540, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994) demonstrates how baseless Kemp's motion for recusal is. Comparing the record of eight weeks of conduct of the trial with numerous rulings favoring defendants, and an overall fair trial, the Court's four-page remarks following the recording of the verdicts, is not grounds for post-trial relief. The testimony in this case, reported in the media on a daily basis and often finding its way to the front page of the newspapers, showed that, totally apart from the guilt or innocence of the defendants, something was wrong in Philadelphia's City Hall, and needed fixing. A judge is not a piece of stone who must stay silent after hearing such testimony, and jurors need not ignore their civic interests when they leave the courtroom.

## D. *Kemp Was Not Prejudiced by Denial of Severance of Offenses*

Prior to trial, defendant Kemp moved for separate trials on Count 1 and Counts

45–51 of the superceding indictment, asserting that the honest services conspiracy was entirely separate from the church loan scheme charged in Counts 45–51. The Court denied this request, finding that all of the charges against Kemp are "of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan" (*citing* Rule 8(a) F.R.Crim. P.). (Court's Memorandum, December 2, 2004, at 3.)

At trial, the evidence showed that the church construction loan came from Commerce Bank and the jury could have found that it was made by defendant Umbrell as one of many benefits to Kemp. There was also evidence that Kemp had fraudulently misled Commerce Bank, which also provided a connection between Kemp's criminal activities as charged in Count 1 and Counts 45–51. In addition, all of Kemp's various fraudulent activities were connected to the income tax evasion charges in Counts 62 and 63. On this ground, Kemp has the burden to demonstrate "clear and substantial prejudice," *see United States v. McGlory,* 968 F.2d 309, 340 (3rd Cir.1992), but has not done so.

 The Court reiterates its pretrial finding that all defendants and offenses were properly joined under Rule 8. The Court rejects Kemp's argument that he was prejudiced by the evidence at trial concerning separate offenses. The verdict sheet of the jury reflects careful consideration of all of the charges, in that Kemp was convicted of some counts, acquitted of others, and the jury was unable to agree on still other counts. This, in and of itself,

suggests the jury made a "reliable judgment about guilt or innocence." *See Zafiro v. United States,* 506 U.S. 534, 538–539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). Furthermore, this issue is within the Court's discretion and Kemp has not cited any cases which would support a finding of abuse of discretion.[7]

### E. The Court Did Not Deprive Kemp of a Fair Trial by the *Ingrid McDaniels Rulings*

Ingrid McDaniels is a young woman who had a romantic, intimate relationship with defendant Kemp for several months during 2003. As the government has indicated in its brief, her testimony was significant because she corroborated several points that were important to the government's case: she accompanied Kemp on trips to Detroit and New York that were paid for by White, she knew of the extravagant expense-paid gifts that White was bestowing on Kemp, and Kemp made a number of statements to her which corroborated Kemp's motive in this case: greed.

Kemp's post-trial motions concerning McDaniels are based on two separate grounds. First, Kemp argues that the Court should have required the government to stipulate that she accompanied Kemp on several trips, but not allowed her to testify. Such a ruling would have been contrary to the decision in *Old Chief v. United States,* 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997), and would have kept from the jury significant information about Kemp's activities, his statements and

---

7. The Court notes that it has found, in connection with the imposition of sentence on Kemp, that the conspiracy charged in Count 1 is not "closely related" under U.S.S.G. § 3D1.2 *et seq.* to the extortion church loan or the tax evasion offenses. There is no necessary correlation between such a finding under the Sentencing Guidelines as impacting on the Court's pretrial decision to refuse a severance of offenses in the indictment. The touchstone of the Sentencing Guidelines is, post-trial, whether the crimes are "closely related"—which is an entirely separate concept from the issue of whether Kemp was prejudiced by the joinder of separate offenses at the trial.

his motive, all of which were corroborative of the government's allegations.

 Secondly, Kemp contends that the Court improperly refused to allow defense counsel to interview McDaniels on the morning of her testimony. This argument is an inaccurate characterization of the record. In fact, Kemp's counsel had interviewed McDaniels prior to her testimony, apparently by telephone—but there is nothing in the record whatsoever to support any finding that they could not have interviewed her in person.

Nonetheless, when McDaniels appeared in the courthouse, the government was prepared to call her to the witness stand immediately. Without any stated reason, defense counsel expressed a desire to interview her before she testified, and the Court conditioned that circumstance on the presence of an FBI agent, to which defense counsel objected, and the Court thereupon ordered McDaniels to take the witness stand.

In the first place, defendant Kemp has failed to show any prejudice from the Court's ruling. There is no showing that McDaniels testified untruthfully, or at variance with her prior statements to either defense counsel or to the government. Further, defense counsel had previously interviewed McDaniels and stated no reason why the trial should be interrupted for her to be interviewed as she was approaching the witness stand. In this sense the Court felt that defense counsel were attempting to delay the trial or perhaps create some issue as to her availability or bias or credibility—issues which could have been and should have been developed in pretrial interviews, or at least prior to the day of her testimony.

In order to be fair to her, and to prevent McDaniels from feeling any last minute pressure from the defense, which she may have inferred notwithstanding the undisputedly professional approach defense counsel would have taken, the Court determined that the presence of an FBI agent at the interview would allow the government to have a witness available in the event McDaniels was accused of any inconsistent or incorrect statements on cross examination.

If defense counsel had agreed to this, which was not an unreasonable condition under all the circumstances, then McDaniels' appearance would have been delayed shortly, but defense counsel refused to accept the suggestion and thereupon the Court directed that McDaniels take the stand and testify.

 According to Kemp's motion, the Court's refusal to allow defense counsel to interview McDaniels before she took the stand on March 18, 2005, unless an FBI agent was present, and the subsequent denial of the request to interview her *with* an FBI agent present, constituted a violation of Kemp's Sixth Amendment right to equal access to government witnesses. Kemp's brief cites to *Gregory v. United States,* 369 F.2d 185 (D.C.Cir.1966), and *United States v. Mendez–Rodriguez,* 450 F.2d 1 (9th Cir.1971), for the proposition that a defendant is denied a fair trial where defense counsel is not provided a fair opportunity to interview government witnesses. (Memo. of Law in Support of Motion for New Trial at 13–14).

The government's response argues that the Court committed no error for the following reasons: the Court did not prevent Kemp from interviewing McDaniels but only attempted to protect McDaniels from intimidation by asking that an FBI agent be present; Kemp had long known McDaniels would be a witness at trial and could have interviewed her previously; and Kemp's counsel did in fact speak with McDaniels twice after the trial began, for five minutes once and then again for one minute. (Government's Response at 199–

201.) The government also points out that Kemp does not explain how he was prejudiced by the Court's ruling or how an interview with McDaniels at that moment would have assisted his defense. *Id.* at 200.

As to the authority relied upon by Kemp, the government argues persuasively that the cases are inapplicable. In *Gregory*, which was a capital case in which the defense has a statutory right to a list of government witnesses, the prosecutor had advised the witnesses not to talk to defense counsel unless the prosecutor was present. *Gregory*, 369 F.2d at 188. The D.C. Circuit ordered a new trial on the grounds that "there was unquestionably a suppression of the means by which the defense could obtain evidence," because "the prosecutor's advice to these eye witnesses frustrated [defense counsel's] effort and denied appellant a fair trial." *Id.* at 189.

Here, Kemp does not allege that the prosecution told McDaniels not to talk to Kemp's counsel or in any other way denied Kemp access to witnesses. Neither does Kemp allege that the Court in any way prevented or limited his access to McDaniels before or during trial, except at the moment she was arriving to testify. Therefore, Kemp's argument that he was prevented from having a fair opportunity to interview McDaniels is unpersuasive.

The other case cited by Kemp involved an accusation that the government intentionally prevented the defendant from calling certain witnesses in an alien smuggling case by deporting the potential alien witnesses to Mexico. *Mendez–Rodriguez*, 450 F.2d at 4. The Ninth Circuit reversed the district court's conviction, noting that the requirement that a defendant show that the witnesses would have offered testimony favorable to the defense could not be applied in this case because, due to the deportations, the defendant had been "de-

prived of the opportunity to interview said witnesses." *Id.* at 5. The Supreme Court, however, later abrogated the holding in *Mendez–Rodriguez*, holding that under such circumstances, although the loss of an opportunity to interview the witnesses means that "the defendant cannot be expected to render a detailed description of their lost testimony," the defendant must still explain "what material, favorable evidence the deported [potential witnesses] would have provided for his defense." *United States v. Valenzuela–Bernal*, 458 U.S. 858, 874, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982). Clearly, the issue in these cases—what a defendant must show in order to establish a violation of the Fifth or Sixth Amendment in cases where the government has deported potential witnesses—is inapplicable here. Kemp does not allege that the government attempted to remove McDaniels or in any other way interfere with his opportunity to interview her before trial.

As to the Court's suggestion that morning that Kemp's counsel could interview McDaniels only with an FBI agent present, the government cites *United States v. Soape*, 169 F.3d 257, 270 (5th Cir.1999), which lists cases in which defense counsel's access to witnesses was properly limited by the trial court in order "to prevent harassment or other wrongdoing." Kemp's motion offers no contrary authority for the proposition that the limitation suggested by the Court to protect McDaniels from harassment violated Kemp's Fifth or Sixth Amendment rights.

## V. The Court Properly Revoked Kemp's Bail and Required Him *To Start Serving his Sentence Immediately*

█ At the conclusion of Kemp's sentencing, as he had been previously advised, the Court revoked Kemp's bail and re-

quired him to start serving his sentence as of the date of imposition. In doing so, the Court followed the applicable statute, 18 U.S.C. § 3143(b), entitled "Release or Detention Pending Appeal by the Defendant," which provides that a defendant in Kemp's position "be detained" unless the judicial officer finds . . . that the appeal is not for purpose of delay and raises a substantial question of law or fact likely to result in reversal or an order for a new trial. In *United States v. Miller*, 753 F.2d 19 (3rd Cir.1985), the court held that the definition of a "substantial question of law or fact" means that the significant question at issue is one which is either novel, which has not been decided by controlling precedent, or which is fairly doubtful." *Id.* at 23.

The Court has only considered this ground because the Court does not find any evidence that Kemp is likely to flee or that he is dangerous to the public while on bail.

*Miller* must be read in conjunction with *United States v. Smith*, 793 F.2d 85 (3rd Cir.1986), which added to the definition of "substantial question" the requirement that "the issue on appeal be significant, in addition to being novel, not governed by controlling precedent or fairly doubtful." *Id.* at 88. Also, *Smith* held that a legal or factual question is deemed significant if it is "debatable among jurists or adequate to deserve encouragement to proceed further." 793 F.2d at 90.

As to Kemp's motion for judgment of acquittal, the Court found, as noted above and reiterates, that the evidence against Kemp was overwhelming and he makes no substantive arguments in his post-trial motions.

As for Kemp's motions for a new trial, the Court finds that all of them raise issues which were in the discretion of the trial court, and that Kemp has failed to show any abuse of discretion.

Kemp's arguments on some of these issues, such as voir dire, the severance of offenses issue, the *Batson* and *Brady* issues, leave out important facts that are key to understanding the reasons for this Court's rulings during the trial.

As to the issue of Juror No. 11, the Court reiterates that its ruling was in full accord with those precedents decided by other circuits. As to whether the issue concerning Juror No. 11 is "significant" under *Miller*, it should be noted that the issue in that case concerned a constitutional attack on F.R.Crim. P. 23(b), authorizing a jury of less than twelve jurors, and the court denied bail. In *United States v. Rubashkin*, Judge Hutton of this Court held that an issue which is within the Court's discretion is not a substantial issue "because it is not debatable among jurists." 2003 WL 1493967 (E.D.Pa.2003). See also Judge Rambo's recent exposition of reasons for denying bail to a "white collar" defendant connected in the Rite-Aid fraud prosecutions, where she specifically held that the absence of a Third Circuit holding on a specific point does *not* mean an issue is "novel." *U.S. v. Brown*, 356 F.Supp.2d 470 (M.D.Pa.2005) (appeal denied, No. 04–4164 (3d Cir.2005)).

## VI. *Conclusion*

The motions for Judgment of Acquittal and for New Trial of Kemp and Knight were properly denied. For the reasons stated on the record at the time of the sentencing, the Court justifiably revoked Kemp's bail. The conviction of a former public official for multiple, serious offenses of corruption and fraud warrants immediate post-sentence imprisonment. The time had come for Kemp to start the punishment he deserves for his crimes.

As to the length of the prison sentence, the Court gave its reasons at some length on the record. Kemp's corruption was

purposeful, lengthy and very damaging to the City; his extortion was wanton, and his frauds further exposed his criminal intent and greed. It is important for the criminal justice system that judges have no tolerance for public corruption.